[PHILADELPHIA, MARCH 27, 1829.]

## LANCASTER *against* DOLAN.

### EJECTMENT.

A mortgagee is a purchaser within the intent of the Stat. 27 *Eliz. ch.* 4.

In *Pennsylvania* a voluntary conveyance is not void against a subsequent purchaser by force of the Stat. 27 *Eliz. ch.* 4.

Under the act of assembly of the 18th of *March*, 1775, a voluntary deed, duly recorded, is as valid against a subsequent purchaser, as a deed for a valuable consideration, provided it be untainted by actual fraud.

A feme covert is, in respect to her separate estate, to be deemed a feme sole only to the extent of the power clearly given by the instrument by which the estate is settled, and has no right of disposition beyond it.

A power to appoint by any writing in the nature of a will or other instrument, under hand and seal, executed in the presence of two credible witnesses, is well executed by a mortgage, though it contain no reference to the power.

THIS was an ejectment, brought in this court, for a moiety of certain messuages and stores on the east side of Water Street,

Rawle.
1r 231
181 485

1r 231
144 453

1r 231
151 328

Rawle.
1r 231
155 478

1r 231
168 177

Rawle.
1r 231
f198 339
198 340

Rawle.
1r 231
201 394

1 R 231
d214 5237
30 SC 5245

(Lancaster v. Dolan.)

between Market and Chesnut Streets, in the city of *Philadelphia.* It was tried at *Nisi Prius* in *February*, 1828, when, by consent, a verdict was entered for the plaintiff, for a moiety of the premises, subject to the opinion of the court, upon the whole evidence; the court to be at liberty to reduce the verdict to one-fourth of the premises, if they should think proper.

The plaintiff's title was as follows:—On the 16th of *March*, 1820, *Edward Rogers* gave his bond to *Israel Lancaster*, conditioned for the payment of three thousand dollars, in two years from its date, with interest. On the same day, the said *Edward Rogers*, and *Tacy* his wife, executed a mortgage upon the premises in controversy, for the purpose of securing the said bond. This mortgage recited, that *Edward Rogers*, and *Tacy* his wife, were indebted to *Lancaster* in the sum of three thousand dollars; was executed in the presence of two credible witnesses; was duly acknowledged, by both husband and wife, on the day it bore date, and was recorded on the 17th of *April*, 1820. On the 22d of *January*, 1821, the bond and mortgage were assigned, by *Israel Lancaster*, to *John Ross*, Esq., who, having obtained a judgment on the mortgage, on the 23d of *March*, 1826, issued a *Levari Facias* to *July* Term, 1826, under which the premises were sold, on the 22d of *May*, 1826, to *Israel Lancaster*, the plaintiff, to whom the sheriff executed a deed on the 28th *December*, 1826.

The defendants, who were the tenants of *Rogers* and wife, for whom defence was taken, relied on the following title; viz.

On the 24th of *October*, 1811, *Tacy Prior* (who afterwards became the wife of *Edward Rogers*) executed a deed to *William M'Pherson*, in which she covenanted to pay, for the use of her mother, *Mary Berrien*, one-half of all the clear rents she might receive out of certain premises; of which the said *Tacy* was the owner of a moiety. The consideration of this deed was natural love and affection, and one dollar. It was not recorded. On the 6th of *January*, 1815, a deed was executed, of which the following is a copy:—

"This indenture, made this sixth day of *January*, in the year of our Lord, one thousand eight hundred and fifteen, between *Mary Berrien* and *Tacy Prior*, daughter of the said *Mary Berrien*, both of the city and county of *Burlington*, in the state of *New Jersey*, single women, of the first part, and *Burgiss Allison*, of the same place, doctor of divinity, and *Elias Boudinot*, of the same place, doctor of laws, of the second part. Whereas the said *Tacy Prior* was and is entitled to and stood seised of and in a considerable real estate, in the city and county of *Philadelphia*, and state of *Pennsylvania*, being lots of ground, rents, messuages, tenements, and hereditaments, as well as other real estate elsewhere, one-half of which she hath heretofore made over and conveyed to the said *Mary Berrien* for and during her natural life: And whereas the said parties, of the first part, are desirous of securing the said estate,

(Lancaster *v.* Dolan.)

one-half for the sole use and benefit of the said *Mary Berrien*, for and during her natural life, and the residue to the said *Tacy Prior*, for the uses and purposes hereinafter mentioned: to these ends they have solicited the parties of the second part to accept of the trusts hereinafter mentioned, which they have reluctantly done:

"Now, this indenture witnesseth, that the said *Mary Berrien* and *Tacy Prior*, for and in consideration of the premises, and also of the sum of one dollar, lawful money of *Pennsylvania*, to them in hand paid by the parties of the second part, the receipt whereof they do hereby acknowledge, and of every part and parcel thereof do hereby acquit, release, and discharge the said parties, of the second part; have given, granted, bargained, sold, conveyed, released, enfeoffed, and confirmed, and, by these presents, do give, grant, bargain, sell, convey, release, enfeoff, and confirm to the said parties, of the second part; their heirs and assigns, all and singular, the said real estate belonging to the said parties, of the first part, of which they stand seised or possessed, situate, lying, and being in the city and county of *Philadelphia* aforesaid, being lots of ground, rents, messuages, tenements, and hereditaments, as well as other real estate elsewhere, together with the hereditaments and appurtenances to the same belonging, or in any manner appertaining, and also all and singular their estate, right, title, interest, property, claim, and demand, both in law and equity, of, in, and to the same, belonging, or in anywise appertaining thereunto.   To have and to hold, all and singular, the above granted and bargained premises, with every of the appurtenances, unto the said *Burgess Allison* and *Elias Boudinot*, and the survivor of them, his heirs and assigns, to the only proper benefit, use, and behoof of them the said *Burgess Allison* and *Elias Boudinot*, and the survivor of them, his heirs and assigns for ever; in special trust and confidence, nevertheless, that the parties of the second part, and the survivor of them, his heirs and assigns, shall and will hold the one moiety of the premises aforesaid, or equal half thereof to and for the use and behoof, and for the personal support and comfort of the said *Mary Berrien*, while sole, during her natural life; and also shall and will permit the said *Mary Berrien*, while sole, to use, improve, occupy, possess, and enjoy the same, or to receive the rents, issues, and profits thereof, subject, however, to all prior incumbrances already made thereon by the parties of the first part, or either of them: and in case the said *Mary* should marry again, then the moiety of the said premises to be held, by the parties of the second part, and the survivor of them, his heirs and assigns, for the only use and benefit of the said *Mary*, personally, and free from all interference, or claim, or control, of her husband, or any other person whatsoever; and the personal receipt or discharge of the said *Mary*, notwithstanding her coverture, shall be the only voucher or discharge for any payment that shall be made under this trust therefor.   And, in further trust, as to the other moiety or remaining equal half part of the

(Lancaster *v.* Dolan.)

above granted and bargained premises, during the natural life of the said *Mary;* and as to the whole of the said premises, after the death of the said *Mary*, the said parties of the second part, and the survivor of them, his heirs and assigns, shall and will hold the same, in like manner, as aforesaid, to and for the only use and behoof, and *for the personal support and comfort of the said Tacy Prior;* and also shall and will permit and suffer the said *Tacy Prior*, while sole, to use, improve, occupy, possess, and enjoy the same, and to receive all and singular, the rents, issues, and profits thereof, subject, however, to all incumbrances heretofore made thereon by the said *Tacy;* and in case the said *Tacy* should marry, then the same to be held to and for the only and personal benefit of the said *Tacy*, whether she be covert or sole, free from all interference, claim, or control of her husband, or other person whatsoever; and the per-, sonal receipt and discharge of the said *Tacy*, notwithstanding her coverture, shall be the only voucher or acquittance for any payment that shall be made under this trust, or for the use, occupation, or enjoyment of any part thereof, or for any of the rents, issues, and profits arising from the same. And on this further special trust and confidence, that after the death of the said *Tacy*, the premises aforesaid shall be held for the use of such person and persons, and to such uses and benefits, and for such term or estate as the said *Tacy*, in her lifetime, and whether she be married or single, and, notwithstanding her coverture, shall designate, order, or direct by any writing, either purporting to be her last will and testament, or other writing whatsoever, executed under her hand and seal, in the presence of, at least, two credible witnesses; and in case the said *Tacy* should die without leaving any such writing, purporting to be her last will and testament, or other writing, as aforesaid, then, and in such case, the said trustees, &c., shall hold the premises to and for the sole use and behoof of such issue as the said *Tacy* may leave, equally to be divided between them in fee simple. But if the said *Tacy* should die without leaving any issue, then the premises aforesaid shall be held in trust for the sole use and benefit of the brothers and sisters of the said *Tacy*, as shall be living at the time of her death, though but of her half blood, share and share alike, in fee simple, or to them, their heirs and assigns for ever. But if the said *Tacy* should die without leaving any issue, or brother, or sister, then the premises aforesaid shall be held in trust for and to the use of her heirs, on the part of the mother, in fee simple, share and share alike, as aforesaid. And, further, that if it should so happen, from any adventitious circumstances, that, in the opinion of the said trustees, or the survivor of them, his heirs and assigns, it should be more advantageous, and for the benefit and emolument of the parties of the first part, or either of them, their heirs and assigns, to have any part of the premises aforesaid sold or disposed of, that then the said trustees, and the survivor of them, his heirs and assigns, with the approbation and consent of the parties of the

(Lancaster *v.* Dolan.)

first part, or the survivor of them, shall and may sell, bargain, grant, and convey, in fee simple, or otherwise, all or any part of the real estate aforesaid, for the most money that may be got for the same, and vest the nett proceeds thereof in other productive real estate, to be held by the said trustees, or the survivor of them, his heirs and assigns, under and subject to the same trusts, uses, and purposes as above set forth: and it is further agreed, that in case the said trustees shall be put to any costs, charges, or expense, in the management of this trust, the same shall be paid out of the rents, issues, and profits of the premises. And the said parties of the second part, for themselves, their heirs, executors, and administrators, do hereby covenant and grant, to and with the parties of the first part, their heirs, executors, and administrators, that they, the parties of the second part, will well and truly execute and perform the several trusts, above set forth, to the best of their abilities and knowledge. In witness whereof, &c."

This deed was recorded on the 21st of *February*, 1815.

*James Henderson,* Esq., who was examined as a witness for the defendants, deposed, that he had been the agent of Mrs. *Berrien* since *Tacy Prior's* deed, in 1811: That he had received the rents of a moiety of the estate, and paid one-fourth part to her, or her order, and the other fourth to *Tacy Prior*, before her marriage with *Edward Rogers*, and since that time, either to herself, or to her husband, at her request: That he recollected having heard Mr. and Mrs. *Rogers* say something about their consent to the transfer by *Lancaster* to *Ross:* That he wrote the mortgage, but could not say whether or not he mentioned the deed of trust to *Lancaster:* That he believed it was adverted to after the execution of the mortgage, and that he did not see *Lancaster* at all before the mortgage was given.

*Binney*, for the plaintiff.—Whatever estate *Tacy*, the wife of *Edward Rogers*, had authority to dispose of, by the mortgage of the 16th of *March*, 1820, *Lancaster*, the plaintiff, is entitled to recover in this ejectment. The question then is, what power had she by virtue of the deed of the 6th of *January*, 1815? The positions contended for are—

1. That she had power to dispose of one-half of her original moiety, (or one-fourth of the whole) for the term of her own life, and the reversion of the whole moiety after her death, and that of Mrs. *Berrien*.

2. That she did dispose of them effectually by the deed of mortgage of the 16th of *March*, 1820.

3. That she did also dispose of the one-fourth, voluntarily granted by her to Mrs. *Berrien*, and that the plaintiff is entitled to recover that.

It is not indispensable to the plaintiff's success, that the court should decide whether the reversion of Mrs. *Rogers*, after her death, and that of Mrs. *Berrien*, has been well appointed by the

(Lancaster *v.* Dolan.)

deed of the 16th of *March.* It is only material to decide on the disposition of her life interest, which is the present possessory title; but as it is important to the parties to know their rights, present and future, it will be proper to advert to the whole question.

1. By the deed of the 6th of *January*, 1815, Mrs. *Rogers* had an estate for her life, in one-fourth of the premises in dispute. It was an estate in her trustees, *for her sole and separate use* for life, and the deed contained no express restraint on her power to dispose of it. There is no mode of disposing of it pointed out so as to admit of the suggestion, that there is an implied prohibition of all other modes of disposition. On the subject of implied restraints much controversy has existed, some holding, that if a mode be pointed out, it is in the nature of a power, and all other modes are prohibited; while others hold that the wife has the general authority of an owner, and that no implied restraint arises from the designation of a mode in which she may convey. Being an estate for her separate use for life, she had power to dispose of it as if she had been a feme sole. *Bell* v. *Hyde*, *Prec. in Ch.* 328. *Norton* v. *Turvill*, 2 *P. Wms.* 144. *Gregly* v. *Cox*, 1 *Ves.* 517. *Davison* v. *Gardner, Sugd. on Vend.* 393. *Hulm* v. *Tenant*, 1 *Br. C. C.* 16, 19, 21. *Sugd. on Pow.* 113, 114. *Clancey on Married Women*, 351. Whether it be a trust in another to receive and pay her the rents, or a use, to occupy and receive herself, is wholly immaterial. *Sugd. on Powers*, 115, 116, 118, 119. *Brown* v. *Like*, 14 *Ves.* 302. *Hesse* v. *Stevenson*, 3 *Bos. & Pull.* 565. *Fettiplace* v. *Gorges*, 1 *Ves. jr.* 46. 3 *Ves. jr.* 437. 9 *Ves. jr.* 524. *Jaques* v. *The Methodist Epis. Church*, 17 *Johns.* 548. 3 *Johns. Ch. Rep.* 108. *Newlin* v. *Newlin*, 1 *Serg. & Rawle*, 275. *Dullam* v. *Wampole*, 1 *Peters*, 116. The only case in which the wife cannot dispose of the whole, is where it is not her own separate property, but the fund is given by the husband to trustees, to stand in the place of maintenance during their separation, for which he continues liable. *Hyde* v. *Price*, 3 *Ves. jr.* 437. *Sugd. on Pow.* 117. In this case, the estate belonged to the wife. She only could tie her hands, and she has not done so. As to her life estate, there is then no restraint to deprive her of the power to dispose of it as a feme sole; to charge and incumber it as she pleased.

As to the reversion, she had power to dispose of it, by any writing under her hand and seal, executed in the presence of two credible witnesses. There is no other restriction. The mortgage may be considered as a valid transfer, and as an appointment also. As a transfer, it had her separate examination, an assurance that it was not done by her husband's influence. It was the statutory mode prescribed for the conveyance of the wife's estate by the act of the 24th of *February*, 1770, *sect.* 2, *Purd. Dig.* 117, which declares that such a conveyance shall be as valid as if it were executed by a feme sole. It has, too, all the characteristics of a good appointment. It was executed under hand and seal, which was all the

(Lancaster *v.* Dolan.)

deed of trust required. It is an established rule, that if the grantor has both a power and an interest, and he creates an estate which cannot be fed out of his interest, it shall be fed out of his power, though there be no reference to it. *Sugd. on Powers*, 212, 294, 296, 297, 298. *Campbell* v. *Leach*, *Amb.* 740. If he has a power, and no estate, a conveyance generally, with the requisite formalities, will take effect under his power, though made without reference to it. *Sir Edw. Clerr's Case, Sugd. on Pow.* 282. A mortgage is therefore a good disposition of the estate. *Peace* v. *Spierin*, 2 *Dess. Chan. Rep.* 460, is an analogous case.

As to the settlement on Mrs. *Berrien*, it was voluntary, and therefore fraudulent and void against a subsequent purchaser. This is a great question, but it is, at this day, settled beyond all doubt in *England* under the stat. 27 *Eliz. ch.* 4. *sect.* 2, by decisions which are binding authorities here. The legal presumption is, that a party who subsequently sells for a valuable consideration, did, by his former voluntary conveyance, intend to deceive. *Gooche's case*, 5 *Co.* 60. *Colville* v. *Packer*, *Cro. Jac.* 158. *Prodgers* v. *Langham*, 1 *Sid.* 133. *White* v. *Hussey, Prec. in Ch.* 14. *Tonkins* v. *Ennes,* 1 *Eq. Ab.* 334. *White* v. *Sansom*, 3 *Atk.* 412. *Lord Townsend* v. *Windham*, 2 *Ves.* 10. *Roe* v. *Mitton*, 2 *Wils.* 356. *Goodright* v. *Moses*, 2 *W. Black.* 1019. *Chapman* v. *Emery, Cowp.* 280. This still continues to be the settled and decided law. *Doe* v. *Martin*, 1 *Bos. & Pull.* 332. *Mercer* v. *Welsmore*, 8 *D. & E.* 528. *Evelyn* v. *Templar*, 2 *Br. C. C.* 149. *Roberts on Frauds*, 13, 17, 33, 37, 66, 73. *Ridgway's Lessee* v. *Underwood, Whart. Dig.* 291, *pl.* 26, 1*st Edit.*

That a mortgage is a purchaser is well settled. 1 *Eq. Cas. Ab.* 353. *Chapman* v. *Emery*, *Cowp.* 280. *Roscarrick* v. *Barton*, 2 *Chan. Ca.* 220. *Senhouse* v. *Earle, Ambler*, 289. *Roberts on Frauds*, 373, 392. *Verplank* v. *Sterry*, 12 *Johns.* 536.

*J. R. Ingersoll*, for the defendant, made three points:—

1. The mortgage is ineffectual to bind any of the property contained in it.

2. If operative at all, it can only affect the life interest of *Tacy Rogers* in one-fourth of the premises, and can have no effect either upon the one-fourth which belongs to Mrs. *Berrien*, or on the remainder in the whole, which belongs to Mrs. *Rogers'* children.

3. And, at all events, it cannot bind more than one-fourth of the premises claimed, the other one-fourth being a life estate vested in Mrs. *Berrien*, who is in full life.

1. The broad question has never yet been determined in *Pennsylvania;* whether a feme covert, who has executed a conveyance of her separate estate to trustees, can make any further disposition of it herself, except under the provisions of the deed of trust; that is, whether the enumeration of her powers limits them to that enumeration, or the absence of particular restrictions leaves her, where unrestrained by special clauses, to dispose of the property as she

(Lancaster *v.* Dolan.)

pleases.   In the former case, she can do nothing but what she is
specially authorized to do; and, in this case, the mortgage not being
enumerated among her powers, it is void on that account alone.   In
the latter case, she can do every thing which she could do, if the
deed of trust had never been made, unless there are restrictions by
implication, for there are certainly none of an express and positive
character.   If she has this power, one of the great objects, perhaps
the principal one of a marriage settlement, is frustrated.   The objects
generally in view in making marriage settlements, are, first, to pre-
vent a husband's creditors from making a direct and forcible inva-
sion on the separate property of the wife.   This does not need any
settlement if the property has never been reduced to his possession;
and even where it has been, he in many instances becomes, and in
equity is treated, as trustee for his wife.   Even a court of law will
sometimes extend its protection to the wife against the husband,
holding that the persons named in a will as trustees for the person
from whom she claimed, were also to be considered as trustees for
her. 2 *Roper,* 152, 153.

The second object of such a settlement is to guard against the
necessities, rapacity, and undue influence of the husband himself,
which rarely can be done without a deed of settlement, and which
is always in view when such a deed is made.   This last and
main object will be entirely frustrated on the principle which the
plaintiff maintains.   It is no answer to say, that as soon as the law
is pronounced it will be known and followed, and marriage settle-
ments hereafter framed in accordance with it.   Many exist at this
moment, and involve property to an incalculable amount, the dis-
positions of which cannot now be changed.

This point is undecided in *Pennsylvania.*   In *New York* the
final decision was in favour of the wife's power.   The elaborate
views of Chancellor KENT led him to a different result, but two
judges, (SPENCER and PLATT,) and a majority of the senators dif-
fering from him, his opinion was reversed. 17 *Johns.* 594. 3 *Johns.
Ch. R.* 19.   In *South Carolina* the final decision was against the
wife's power, Chancellor DESSAUSSURE having given a different
opinion, which was reversed. *Ewing* v. *Smith,* 3 *Dess.* 417.   As
to the *English* cases, Chancellor KENT says, (3 *Johns. Ch. R.* 86,)
" At the first glance of the authorities they appear to be full of con-
tradiction and confusion."   The law cannot, therefore, be consi-
dered as settled.   On each side formidable names are to be found:
Lord MACCLESFIELD, Lord TALBOT, and Lord HARDWICKE, are
one way, while Sir WILLIAM GRANT, Lord BATHURST, Sir PEP-
PER ARDEN, Lord ROSLYN, and Lord ALVANLY are the other way.
Lord THURLOW and Lord ELDON may be considered as doubtful.
*Coverly* v. *Dudley,* 3 *Atk.* 541. *Cas. Temp. Talb.* 43, (*note.*) 2
*Ves. jr.* 488. 4 *Ves.* 129. 5 *Ves.* 692. 4 *Bro. Ch. Ca.* 483. 1 *Bro.
Ch. Ca.* 16. 3 *Ves.* 437. 11 *Ves.* 209.   Turning aside from the
troubled current of authority, how should it be on principle?   By

(Lancaster *v.* Dolan.)

a deed of trust the property passes out of the woman who has been its proprietor. It is a gift to certain purposes, which she cannot of herself change, because the only mode of change contemplated is pointed out, viz. by the trustees with her consent. It is a limited, special power, which must be specially pursued. Various alterations have taken place in the law of marriage. It was formerly held, that separation and separate maintenance made the wife liable solely. But it is otherwise now. *Clancey,* 63, 64. It was likewise held, that the same circumstances rendered a wife liable to a commission of bankruptcy. *Ex parte Preston, Cooke's Bank. Law,* 30. The principle on which courts of equity formerly went, in relation to this subject, would not now be upheld. Lord MACCLESFIELD says, "It is against common right that the wife should have a separate property from her husband, and therefore all reasonable intendments are to be made against her. *Powel* v. *Hankey,* 2 *P. Wms.* 82. A married woman certainly has not more power over her separate estate than another person. It is not an uncommon thing for a dissipated, an indifferent, or a weak man to convey his estate in trust, in order to place it out of his own control. When he has done so, it is gone. If the deed contain no reservations to himself, it is gone entirely; if there be reservations, they operate as exceptions to his entire relinquishment of the estate, and *pro tanto* enable him to act. But the exceptions prove the rule. What was the intention of this contract? If that can be discovered *ex visceribus,* it will be carried into effect. Great stress is not laid on the word "only," though it occurs more than once in the deed. No one can doubt that the settlement was made with a view to protect her property from her husband's debts, and from the consequences of her own fondness or fears, which might lead her to discharge them. The protection contemplated was not only from his debts, but from his interference, which was as much to be dreaded, if exercised through her agency, as independently of it. It was for *her personal support and comfort* that the fund was set apart, and therefore it could not be alienated. *Knight* v. *Dowling, Carthew,* 120. *Herring* v. *Brown, Id.* 23. *Sugd. on Pow.* 116, 299. 3 *Johns. Ch. R.* 88. *Hyde* v. *Price,* 3 *Ves.* 437. 9 *Ves.* 524.

The mortgage is not such an appointment as the deed of trust contemplated. The provision is, that she may designate the uses, persons, &c., for which and for whom the estate shall be held by any writing purporting to be a last will and testament, *or other writing,* &c., but it must be a designation to take effect after her death. The provision in the latter part of the will for a sale, does not support the mortgage, because the sale must be by the trustees, though the approbation of the *cestui que trust* is required. The appointment, too, must be connected with the trust. The trustees are to hold on special trust and confidence, for such uses as she may designate, but this mortgage takes from them all trust and confidence, by destroying the trust estate altogether. Again; the power

(Lancaster *v.* Dolan.)

must be strictly complied with. *Sugd. on Powers,* 211, 213, 215. Upon the principle of *intention,* all the cases in *Pennsylvania* have been decided. *Dallam* v. *Wampole,* 1 *Pet.* 116, was a case of personal property, the principal of which, and not merely the interest, was settled to the sole and separate use of the wife. Any receipt from her would have been good for the whole. The case of *Newlin* v. *Newlin* (1 *Serg. & Rawle,* 275,) went on the same principle. The Chief Justice declares, (p. 278,) "The object of the testator was to give his daughter the absolute power over the annuity," &c. "Her receipt was to be their (the trustees') discharge;" and when she received the money, she might have given it to her husband, or paid his debts with it. No such power is to be found in the deed now under consideration. The case of *Peace* v. *Spierin,* (2 *Dess.* 460,) does not prove, as is supposed, that the mortgage is an execution of the power of appointment. That case shows that the wife was indebted, at the time of the settlement and marriage, and the mortgage was given as a mere substitution for the mortgage for the purchase money. In common parlance, a mortgage is not a deed or conveyance. Mrs. *Rogers* did not suppose, in executing it, that she was executing the appointment, and that is the test.

The position is assumed, that a voluntary deed is void against a subsequent purchaser, either with or without notice; a most harsh and unreasonable doctrine, if it be law, and applicable to this case. But it is neither the one nor the other. The principle asserted is, that the original owner, when he sells, proves that he had acted fraudulently in making the former voluntary deed, and that therefore it is void. This may be true as respects the grantor, but it would operate very unjustly as respects the grantee, who may have made many justifiable and laudable arrangements, founded upon the supposed ownership, all of which are to be frustrated at a distant day. If the principle of some of the old cases—that a voluntary deed is void—be established, it will carry the evil even beyond this point, and extend it to the vendees of a voluntary grantee. But this is not the law. The principles of the case of *Anderson* v. *Roberts,* (18 *Johns.* 515,) are perfectly sound, viz. That a voluntary deed is not void, but voidable: That, to avoid it, the conduct of the grantee, as well as that of the grantor, must be fraudulent: That a *bona fide* purchaser, on either side will hold the property, and that the construction of the statutes 13 and 27 *Eliz.* is the same. There are many *English* cases, too, of an old date, which do not support the principle, that a voluntary deed is for that reason void. *Sagittary* v. *Hide,* 2 *Vern.* 44. *Jones* v. *Marsh, Cas. Temp. Talb.* 64. *Doe* v. *Routledge, Cowp.* 710. *Stephens* v. *Furman,* 1 *Ves.* 73. *Ithell* v. *Beane, Ib.* 215. The argument is, that the subsequent sale affects the grantor with fraud; but it is to be remarked, that, in the present instance, the grantor was a married woman, under the influence of the husband, and therefore error is not imputable to her. *Marchioness of Blandford* v. *Dutchess of Marlborough,* 2 *Atk.* 545.

(Lancaster *v.* Dolan.)

But the plaintiff is not a purchaser. He is a mere creditor. A mortgagee is, perhaps, under certain circumstances, to be considered a *quasi* purchaser. He may bring ejectment, and thus treat himself as a purchaser; and such was the case in *Chapman* v. *Emery.* But if he acts, not as a purchaser but a creditor, if he treats the mortgage as a security for a debt, he must be considered a mere creditor, and all the principles applicable to him as a purchaser cease. This point is decided by the case of *Ridgway's Lessee* v. *Underwood, Whart. Dig.* 291, *pl.* 27. The principle now established is, that a voluntary settlement is not fraudulent, where the person making it is not indebted at the time, nor will subsequent debts shake it. *Russell* v. *Hammond,* 1 *Atk.* 15. *Read* v. *Livingston,* 3 *Johns. Ch. Rep.* 481. *Hildreth* v. *Sands,* 2 *Johns. Ch. Rep.* 48.

2. The two instruments of *October* 24th, 1811, and *January* 6th, 1815, divested *Tacy Prior* of one half of her interest in the premises, during the life of her mother, and of the whole, after the termination of her own life, unless she disposed of it in the manner provided for by the deed of trust. In the absence of such a disposition, the estate was to go in the channel designated by the settlement, which in some respects changed the regular course of inheritance. All she could control, under any circumstances, was her life estate in one-fourth, and being now dead, no recovery can be had upon it.

3. The life estate of Mrs. *Berrien* is certainly untouched by any thing Mrs. *Rogers* has done. The deed of 1811 is a covenant to stand seised. Such an instrument is good upon the consideration of blood, and cannot be revoked at the pleasure of the covenantor. 2 *Roll.* 785, *l.* 20. Although there may be difficulties in the way of the covenantee suing to enforce a voluntary agreement, yet her protection is entire. The deed of the 6th of *January,* 1815, however, leaves no ambiguity. It confirms that of 1811, specifically, and then proceeds to vest in other hands all the several interests. No objection is raised to it on the ground of fraud on the future husband. It was directed against no particular person whatever, and it was recorded soon after its date.

*Reply.*—It is objected, 1st, that a feme covert has no power over her separate estate, except what is expressly given to her, and for this *Ewing* v. *Smith,* 3 *Dess.* 417, is relied on. There is no warrant for this doctrine in any other case; and it is contrary to the law of *Pennsylvania,* as authoritatively settled in *Newlin* v. *Newlin,* 1 *Serg. & Rawle,* 275. The controversy has mainly been, between excluding all powers of disposition except such as are pointed out, and excluding none, except such as are negatived. *Newlin* v. *Newlin* is an authority to show that no restraint exists, where none is expressed. The intention of the testator in that case was referred to, but it was inferred from the absence of any express restraint.

2. It is said that *Tacy Prior* was restrained as to the disposi-

(Lancaster *v.* Dolan.)

tion of her life interest, because, during her life, the premises were to be held for her *personal support and comfort.* For this *Sugd.* 116, is cited as an authority.

If this were law, it would be strange doctrine indeed, since the same object is implied in the settlement of every separate estate, and in none more than in that upon which *Newlin* v. *Newlin* was decided, which provided that the interest was to be paid annually for the daughter's separate use and benefit. But this is not *Sugden's* doctrine; nor that of *Hyde* v. *Price*, to which he refers. The words "personal support and comfort," are not in that case. The characteristics of that case are, that the wife was not to receive at all, but another was to receive for her maintenance, and that a trust was created by the husband to support the wife during separation. The characteristics of the present case are, that it was *Tacy Prior's* own estate, and that she was to receive herself, and her receipt to be a discharge. It is impossible to imagine larger rights than she has given to herself. She was to use, occupy, and enjoy; to receive the rents and profits, and her receipt was to be the discharge, not to the trustees, but to the tenants. The words "personal comfort and support," are used in relation to her use while sole, while, in case of marriage, the estate is for her "personal benefit," which shows there is no force or meaning in the words. Another argument urged in support of this objection is, that the estate was to be free of all *interference* of her husband. This evidently means in his own right, *jure mariti;* not that she may not dispose of it to him. She could certainly give him the income, which the objection supposes she could not, as it rejects his interference either with or without her agency. All the decisions are against the doctrine contended for. *Separate use,* means that the husband cannot interfere with the estate against her will, and nothing more. No stress, it is admitted, can be laid on the word "*only,*" and "*sole*" has no greater force. To the argument that no control is given to *Tacy Prior* over the capital during her life, it may be answered, that there was none in the case of *Newlin* v. *Newlin,* nor in any other case in which a question has arisen; nor can these questions arise in any case in which such power is expressly given. It is said, too, that the power to sell given to the trustees, implies a restraint upon the right of the *cestui que trust.* But no authority has been cited to show that a restraint on the wife is to be inferred from an authority to trustees. The absence of general authority in the wife, is much more reasonably to be inferred, from reserving a particular authority to her; and yet this is not the law. No one ever supposed that because he gives power to his executor to sell the real estate, his heir, therefore, cannot. The power is granted to the trustees to do that which the *cestui que trust* cannot do. It is to them or the survivor to sell, with the consent of the *cestui que trusts,* or the survivor, and to settle the estates purchased with the proceeds, upon the same trusts. This is not inconsistent

(Lancaster *v.* Dolan.)

with a right in the *cestui que trust* to transfer her interest in the trust.

3. It is further objected, that *Tacy Prior* could not by mortgage appoint the remainder, after her estate for life; because, in the first place, the power reserved requires an absolute deed, and not a mortgage. This is not conceded to be the law. An appointment by way of mortgage, satisfies a power to appoint, generally. *Sugd.* 280. *Lascells* v. *Lord Cornwallis, Prec. in Ch.* 232. *Perkins* v. *Walsh,* 1. *Vern.* 97. Mrs. *Rogers's* was a general power of appointment. A general power is the right to appoint to whom the donee pleases; a particular power is restricted to certain objects. " A general power is, in regard to estates which may be created by force of it, tantamount to a limitation in fee. He (the donee) has an absolute disposing power over the estate, and may bring it into the market whenever his necessities or wishes may lead him to do so." *Sugd.* 432. The mortgage is also objected to as a valid appointment, because it takes effect during her life, whereas the remainder was to be appointed after her death. But it is a mistake to suppose that the trust is for such persons as she shall appoint *to take after her death;* the trust, after her death is, for such persons *as she shall appoint to take.* There is no necessity that the instrument should appoint the party to take *expressly after death.* It has already been shown, that there is no necessity for any reference to the power of appointment. If a party be *cestui que trust* for life, with power to appoint the remainder after his death by deed, it cannot be questioned that he may convey the fee absolutely, or mortgage the fee. Whether the estate for life and in remainder unite and make one estate, it is unnecessary to inquire. In the present instance, the plaintiff has the trust as extensively as Mrs. *Rogers* had it, and how the legal estate stands, is not the subject of inquiry in this court.

As to the voluntary conveyance. The plaintiff is a *purchaser,* because he stands in the shoes of a purchaser or mortgagee. A purchaser under execution upon a mortgage, has all the rights of the mortgagee. It is a sale of the mortgagor's right conveyed to the mortgagee,—a statutory foreclosure of the mortgage. *Whart. Dig.* 291. *pl.* 27. The distinction taken between bringing ejectment, and *Scire Facias* is without solidity. The form of the remedy does not vary the estate or the character of the party. The deed is not denied to be voluntary, in regard to Mrs. *Berrien.* The great weight of authority proves that such a deed is void against a subsequent mortgagee. *The very case* before the court, is the last case decided in *England* before the Revolution, and is an authority. *Chapman* v. *Emery, Cowp.* 280.

As to the merits, the case is clearly with the plaintiff. He is an honest lender upon a mortgage of the estate of the wife. Equity will protect him, and supply all defects in the appointment. *Sugd.* 366, 369.

(Lancaster *v.* Dolan.)

The opinion of the court was delivered by

GIBSON, C. J.—*Tacy Prior,* being seised of a moiety of the premises, executed a conveyance to trustees, by which she limited a moiety of her moiety, to her mother, *Mary Berrien,* for life, and the residue, together with the remainder, after the death of Mrs. *Berrien,* to her own separate use for life: the remainder in fee to such person as she, by any writing in the nature of a will or instrument under her hand and seal, and executed in the presence of two credible witnesses, should designate and appoint; in default of such appointment, to her issue, if more than one, equally, in fee; in default of issue, to her brothers and sisters in fee; and in default of brothers or sisters, to her right heirs on the part of the mother, in fee. She married Mr. *Rogers,* and with him, executed a mortgage to the plaintiff of the entire moiety; on which it was sold and purchased by him at sheriff's sale. The questions which arise, are:—1. Whether the conveyance is void by the statute 27 *Eliz.* as regards the estate limited to Mrs. *Berrien:* 2. Whether Mrs. *Rogers* could dispose of the estate limited to her own separate use, without a power specially reserved: and, 3. Whether the mortgage was an effectual execution of the power as regards this remainder.

It must be admitted, that a mortgagee is a purchaser within the intent of the statute. *Chapman* v. *Emery,* (*Cowp.* 278,) is in point; and whatever may have been the character of the plaintiff originally, he has become a purchaser to every intent, by taking the thing pledged, in satisfaction of the debt. The question then comes to this: Shall we follow the *English* judges in holding every voluntary conveyance void as to subsequent purchasers, or interpret the statute anew, in reference to the circumstances and condition of our own country? Had the *English* construction been established before the *American* Revolution, although it is by common consent, agreed to be harsh and repugnant to natural justice, I would, in parity of circumstances, submit to it on the ground of authority. Whether it was so established, has been discussed by Chancellor KENT, in *Sterry* v. *Arden,* (1 *Johns. Ch. Rep.* 266,) and Mr. Justice SPENCER in *Verplank* v. *Sterry,* (12 *Johns. Rep.* 553,) where the cases are collected and so minutely examined, as to leave no room for a review of them here. The conclusion of the Chancellor is, that " the late cases have declared no new doctrine, and have only followed the rule as they found it long before settled by a series of judicial decisions of too much authority to be there shaken." Mr. Justice SPENCER, on the contrary, thinks that the authorities prior to the Revolution, " are in weight and number decisively adverse to the doctrine which now prevails in *Westminster* Hall." In this, the learned judge undoubtedly asks too much. But he might have conceded much without endangering the argument; for Lord ELLENBOROUGH, on whose opinion the Chancellor particularly relies, goes no farther than to say that " the weight, number, and uniformity

(Lancaster *v.* Dolan.)

of the authorities" (in favour of the modern doctrine,) "*do very much preponderate.*" As to number and uniformity, those collected by him, stand in the proportion of nine to eight; which certainly shows no great preponderance; and the four added by Chancellor KENT, are altogether insufficient to satisfy us that the question had been put at rest, even though some of the authorities on the other side, may, as he alleges, have been but *dicta.* The whole mass evinces a restless and an unsettled state of the professional mind both on the bench and at the bar; and although the weight of authority undoubtedly inclined in favour of the modern doctrine, it could with no propriety be considered as established at the declaration of our independence, the period material to the question of its recognition here. Nothing but an uninterrupted series of authorities established by common consent, ought to sustain a principle on which no titles depend, and which, in its origin, is admitted on all sides to have been erroneous and unjust. The statute is undoubtedly in force here. It does not, however, in terms declare voluntary conveyances to be void; but only such as are made for the "intent and purpose to defraud and deceive such persons as shall afterwards purchase." The intent and purpose were consequently left to the judges, some of whom shortly afterwards began to consider every voluntary conveyance fraudulent without regard to the truth of the case. In *Cadogan* v. *Kennet,* (*Cowp.* 434,) Lord MANSFIELD expressed an opinion that the common law, as it is now universally known and understood, would have attained every end proposed by the statutes of *Elizabeth.* It would have done so undoubtedly; but by a different process, it being a favourite maxim of the common law that fraud must be proved and not presumed. It is evident that the judges were led to carry the construction beyond the maxim, by motives of policy which, I submit, have no place here. Previous to the fourth year of Queen *Anne,* there was no provision for registering conveyances in any part of *England;* and they are registered only in *Yorkshire* and *Middlesex* at this day. It is evident that where conveyances took effect according to priority of date without regard to notice, gifts afforded extraordinary facilities to fraud, in comparison with conveyances for a valuable consideration, the existence of which, in cases of controversy, could be shown as explicative of the transaction. It is, therefore, perhaps not strange that the judges cut the matter short by declaring all voluntary conveyances void, instead of embarrassing themselves with questions of notice; especially as the equity of the donee who paid nothing for the estate, might, under any circumstances, seem unequal to that of a purchaser who had paid a fair price. With us the case is entirely different. The act of 1775, requires all conveyances to be recorded in six months; and declares that "every such deed and conveyance which shall, at any time after the publication hereof, be made and executed, and which shall not be proved and recorded as aforesaid, shall be adjudged *fraudulent and void*

(Lancaster *v.* Dolan.)

*against any* SUBSEQUENT PURCHASER *or* MORTGAGEE *for valuable consideration,* unless such deed shall be recorded as aforesaid, before the proving or recording of the conveyance under which such subsequent purchaser or mortgagee shall claim." This, it will be perceived, is predicated without distinction as to consideration: and it gives rise to an irresistible implication in favour of the converse of the proposition—that every conveyance, without exception, which is thus recorded, is effectual against subsequent purchasers and mortgagees. It seems to me the question might be *safely* rested here. To say the least, it is expressly established, that conveyances shall take effect, not according to priority of date, but of record notice. Title is made a matter of record, and negligence is justly imputable to every one who purchases without having searched the proper office. Such a purchaser can pretend to no equity against one who has done what the law requires, to put him on his guard. It is admitted that a voluntary conveyance is good between the parties; and it is a common principle of equity, that an assignee with notice, must abide by the case of the assignor. But the pretended equity of a subsequent purchaser with notice, even as against a volunteer, would spring from an act, the consequence and design of which would be to enable the donor to cheat the donee. The purchase would be an act of collusion, and all the fraud would be on the side of the purchaser. The palpable injustice of this has drawn from the *English* judges an expression of regret, that voluntary conveyances had not been sustained against purchasers with *actual* notice. With them a distinction between actual and constructive *notice* might be proper: with us, where it is the fault of the purchaser himself, if he have not actual notice, there is not, and there ought not to be, a difference. Such a purchaser is justly chargeable with positive negligence, and would be chargeable with positive fraud, were the consequences to fall on any one but himself. An unregistered conveyance is to be postponed without regard to its consideration, no distinction being made by the terms of the act; and there is no reason for postponing a registered voluntary conveyance, when untainted with actual fraud, that would not equally attach to a conveyance for valuable consideration. The injury to the donee would be as great, although as he gave nothing for the estate, the hardship would be less. Still there would be a hardship, the difference even in this respect, being only in the degree.

As therefore the matter is *res integra* here, we are at liberty to interpret the statute according to the dictates of justice and convenience: at all events, its construction must bend to the provisions of our own statutes; and we are consequently of opinion, that the estate limited to Mrs. *Berrien,* is unaffected by the subsequent mortgage.

In consequence of the death of Mrs. *Rogers,* since the trial, the question which respects the estate limited to her separate use, although exceedingly important in its principles, involves no more

(Lancaster *v.* Dolan.)

at present than the costs of the action.   The conveyance is in trust "to permit her to use, improve, occupy, possess, and enjoy; and to receive all and singular the rents, issues, and profits."   A use thus limited to any other than a married woman or feme in contemplation of marriage, would be executed; but it is immaterial whether the trust be to *pay* a married woman the profits, or to *permit* her to receive them, it being necessary to a separate provision that the legal estate should remain in the trustees, to prevent the husband from taking the profits and defeating the very object of the conveyance. (1 *Saund. on Uses*, 197.)   The estate of Mrs. *Rogers*, therefore, is a trust, and without any power of disposition being annexed to it in the deed.   It has been pressed in the argument that such a power is an inseparable incident of the ownership.   Nothing in the law is more to be deprecated, than those decisions in which the right of a *cestui que trust* to dispose of his estate, has been recognised.   Every attempt to secure a provision to a spendthrift child must prove abortive, while the trustees are bound to follow any disposition of it which he may make.   It is still more unfortunate that, as regards their separate estates, femes covert have been regarded in equity as femes sole.   It has been justly remarked, that if the principle be pushed to its extent, a married woman who has trustees, will be infinitely worse protected than if she were left to her legal rights.   There are instances of wives having been coaxed or bullied out of the protection provided, even at the instant when the settlement was before the Court of Chancery.   Ought we then to follow this principle farther than our own decisions have carried it?   The *English* decisions, since the declaration of our independence, have unsettled every thing.   In some it has been held that the feme may exercise absolute dominion without an express power in the conveyance; in others, that she can exercise no power at all; and to this complexion they will perhaps come at last.   But it is agreed on all hands, that her power is not to be extended beyond her personal estate and the profits of her land.   She has not in a single instance been permitted to lay her hands on the inheritance. There is, indeed, no case in which the question involved the exercise of a power over her own life estate; but if her power does not comprehend the fee when she is the owner of it, it is not easy to understand how it can comprehend a less estate.   It has been held to extend to copyhold, because the estate can be surrendered only by her act; and as she is exclusively the tenant, and the husband's authority is suspended, it seems there is no objection to her act in the court of the manor.   But there is no instance of her having been permitted to dispose of freehold, except in pursuance of the terms of the trust, or by way of power over a use. *Peacock* v. *Monk*, (2 *Ves.* 190,) is express to the point.   An agreement to dispose of the profits of her real estate, has been executed in equity; but in a later case, the Court of Chancery has refused to enforce a security on rents and profits under similar circumstances.   Here, however, the mort-

(Lancaster *v.* Dolan.)

gage was not of the profits, and it would be asking too much to require us to treat it as an agreement contrary to the meaning of the parties.

But, it appears to me, the trust in favour of Mrs. *Rogers*, was *intended* to be unalienable. Although the distinctions on this head are justly obnoxious to the charge of subtilty, there is no doubt that the intention, where it is manifest, must prevail, although it be evinced by less than an express clause. Such an intention has been collected from very slight circumstances, such as a contingent interest in the wife after her husband's death; or a direction to pay the profits into the respective hands of the testator's sisters, as long as they shall live. Here the trust is expressed to be " *for the* PERSONAL SUPPORT *and* COMFORT *of the said Tacy:*" a clause more clearly indicating an intent to prevent alienation by anticipation, than any to be found in the cases in which the exception prevailed; and the estate of Mrs. *Rogers* would therefore be unaffected by a rigid application even of the *English* cases.

In fine, notwithstanding the case of *Newlin* v. *Newlin*, (1 *Serg. & Rawle*, 275,) which was hastily determined on an exception to evidence, we are entirely prepared to adopt the conclusions of Chancellor KENT, in *The Methodist Epis. Church* v. *Jaques*, (3 *Johns. Ch. Rep.* 108,) that the *English* decisions are so floating and contradictory, as to leave us at liberty to adopt the true principle of these settlements; that instead of holding the wife to be a feme sole to all intents as regards her separate estate, she ought to be deemed so only to the extent of the power clearly given in the conveyance; and that instead of maintaining that she has an absolute right of disposition, unless she is expressly restrained, the converse of the proposition ought to be established—that she has no power but what is expressly given.

We are of opinion, then, that the plaintiff did not acquire the estate conveyed to the separate use of Mrs. *Rogers*.

The remaining question depends on a few plain elementary principles. The use as to the remainder of the estate was executed by the statute; consequently the power of appointment reserved to Mrs. *Rogers*, being general, was intended to be exclusively for her benefit. In the words of Mr. *Sugden*, a general power of appointment is, in regard to the estates that may be created by force of it, tantamount to a limitation in fee, not merely because it enables the donee to limit a fee which a particular power may also do, but because it enables him to give the fee to whomsoever he pleases. He has an absolute disposing power over the estate, and may bring it into the market whenever his necessities or wishes lead him to do so. (*Sugd. on Powers*, 482, 485.) But a power to sell implies a power to mortgage, a mortgage being a conditional sale. (*Mills* v. *Banks*, 3 *P. Wms.* 9.) And it would seem, for the same reason, that a power to *charge* will NOT imply a power to mortgage. Under a general power, it has been expressly held that a mortgage is

(Lancaster v. Dolan.)

a revocation, (*Perkins* v. *Walker*, 1 *Vern.* 97. *Thorne* v. *Thorne*, *Ib.* 141,) and there is no reason why the donee may not appoint, by way of mortgage, as he may treat the estate in every respect as his own.   Here the mortgage must be intended to have been in execution of the power, although it contains no reference to it, because as the estate created by it, cannot be served out of Mrs. *Rogers's* interest, it must necessarily be served out of her power.   It was therefore an effectual appointment.

SMITH, J., having been absent during the argument, in consequence of indisposition, took no part in the decision.

Judgment for the defendant, *non obstante veredicto.*