JOHN J. KEIFER ET UX.

vs.

EUGENE CARUSI ET AL.

1. Administrators are bound by the admissions of their intestate as to the usurious character of a promissory note held by them as assets of the estate.

2. While a party to a negotiable instrument cannot impeach its validity after its negotiation, yet as the signature of a married woman thereto is a nullity by reason of her incapacity to contract, her testimony is admissible to impeach such a paper, although purporting to be made by her.

3. So, the joint note of husband and wife is the note of the husband alone, and when such a note is secured upon the separate property of the wife, her testimony will be admissible to impeach the paper upon the ground of usury whenever it is sought to enforce a sale of her property to satisfy the note.

4. The power of a married woman to bind her separate estate by her contract is *sub modo*, only being limited to the terms of the settlement.

In Equity. No. 1746. Decided February 4, 1871.

APPEAL from a decree dismissing a bill filed for an injunction. *Decree modified.*

THE FACTS are stated in the opinion.

Messrs. LLOYD & SCEVA for plaintiffs.

Messrs. JOHN E. NORRIS and E. CARUSI for defendants.

Mr. Justice WYLIE delivered the opinion of the Court:

The bill in the present case was filed by the complainants to enjoin the sale of a piece of land which Mrs. Keifer and her trustee had conveyed in trust to secure the payment of a promissory note executed by them both for $5,800, dated November 20, 1866, and payable to George W. Utermehle or order three years after date with interest semi-annually, which they aver was tainted with usury.

The land was the separate estate of Mrs. Keifer, and she joined her husband in the note, and at her request Mr. Naylor, the trustee, executed the deed of trust to secure the note.

The bill avers that all the money they received was

but $4,000, and that even from this Charles H. Utermehle retained $200 for his services in procuring the loan from his father, the payee of the note.

We have evidence enough as to every part of the transaction; the drawing of the deed of trust; that it was read over to these Germans before it was executed; that they understood its contents, &c., &c., except as to the payment of the money to them. To this there was no witness. The evidence of the officers of the bank where Mr. Charles H. Utermehle kept his account is well calculated to produce the conviction that the allegation of the complainants as to the amount paid them for their note did not exceed the sum of $4,000, if it was that much. Still that evidence, of itself, is hardly sufficient to counterbalance the presumption the other way, arising from the face of the note, and of the deed of trust.

But taken in connection with the fact proved, that Keifer and his wife just prior to this transaction had applied to another party for the loan of $4,000, and that this appeared to be all that they needed, together with the positive testimony of Mr. Schmidt, appears to establish the fact of usury beyond any possible doubt. Schmidt had been spoken to by these parties to obtain for them a loan of $4,000 from Mr. Clagett. Clagett's terms were a note payable one year after date secured by deed of trust, bearing interest at the rate of six per cent. per annum, with twelve per cent. discount from the face of the note. This negotiation failed for the reason that the parties were impatient of the delay of Mr. Schmidt in examining the title, and they fell into the hands of Mr. Charles H. Utermehle, who acted in the matter as the agent of his father. This fact is conceded, or, if not conceded, is abundantly proved. A few days afterwards Mr. Schmidt was informed by Keifer that he had obtained the loan from Mr. Utermehle. "Feeling a little nettled," says Schmidt, "I went to Mr. Utermehle, and complained that he had taken from me that job; that I had expected to

make 2 per cent., besides what I would have received for writing the deed. I asked him at what rate he had negotiated, that I could have got the money at twelve per cent. off, and that I lost by this transaction about $100. *He answered that the old man had advanced the money, and that he had done better.*"

Now, without taking into account the difference between interest and discount in this case, the result would be about as follows:

Under Clagett's offer, the plaintiffs would have given their note at one year with six per cent. for $4,480, besides the $100 to be paid to Schmidt for his services in procuring the loan for them. At the same rate for Utermehle, they would have given their note at three years for $5,440, with interest at rate of six per cent. per annum, payable quarterly, besides the $200 to Charles H. Utermehle for his services in procuring the loan, $5,640. If to this be added the difference between interest and discount for the two years which the Utermehle note would have to run longer than the other, $57.60, and we have the sum of $5,697.60. But Charles Utermehle told Schmidt, "the old man had done better than this." The note in controversy in this cause was for $5,800. It *was* "better," in this sense, but the difference is only $102.40.

We are of opinion, therefore, that the plaintiff's allegation of usury in the note, as well as the amount of the usury, has been proved beyond a reasonable doubt by the admission of Charles H. Utermehle. Besides the evidence referred to, there are other circumstances in the case to which we need not refer particularly which load the transaction with a weight of suspicion, too heavy to be removed.

But it has been replied to these views that the administrators in this case obtained the note in question from George W. Utermehle, subsequently to the decease of their intestate, and through the compromise of an action at law between them as representatives of the estate of Charles H.

Utermehle, deceased, and the said George W. Utermehle, without notice on their part of the alleged usury, and for a full and valuable consideration before the maturity of the note.

But if the full amount of this note should be recovered the proceeds will go to swell the estate of the intestate. These administrators can claim nothing except as the representatives of Charles H. Utermehle, with whom they are bound by privity. The plaintiffs in this suit were not parties to the compromise, or to the action which led to it. As to them, it was *res inter alios acta.* All that they have to do with now is this note held by Charles H. Utermehle's personal representatives as a part of the assets of his estate. These representatives have no title to the note except through their said intestate. It was, to be sure, made payable to George W. Utermehle, but it was found amongst the papers of the son, after his decease; and by agreement of these representatives, indorsed by George W. Utermehle, not for the purpose of transferring a note of which he was the owner, but to vest in these administrators the full formal title of what, it was agreed, they should retain as the property of Charles. If they saw fit to divide the property with George W. Utermehle, and take this note as a portion of their share, they are estopped to repudiate the obligations of proprietorship. They took it as belonging to the estate and they must stand or fall by their election.

Since, therefore, the administrators in this instance have not purchased the note in question, but it has come to them from Charles H. Utermehle along with the rest of his personal estate, they should be bound by his admissions. "The ground," says Mr. Greenleaf, "upon which admissions bind those in privity with the party making them is that they are identified in interest."

The admissions made by Charles H. Utermehle are, in our judgment, competent evidence in the present case

7DC—11

against his administrators, and they establish a case of most oppressive usury upon these ignorant Germans.

But independently of the admissions made by Charles H. Utermehle, Mrs. Keifer's evidence is conclusive of the question of usury if it be competent.

She joined her husband in executing the note, and for that reason it is said she is not competent to give evidence to impeach it.

In Bank of United States *vs.* Dunn, 6 Peters, 51, and Bank of Metropolis *vs.* Jones, 8 Peters, 12, the Supreme Court held that a party to a negotiable instrument, actually negotiated, was not a competent witness to impeach its validity afterwards. The law is held otherwise in England, and in some of the States of this Union, but the decision of the Supreme Court must be the guide of this court.

A married woman, however, is not capable of making a note, and her signature is a nullity. The joint note of herself and husband is his note alone, and the debt is his, not hers. She is, therefore, not a party to the note which she signs. Her signature gives it neither value nor negotiability. She is, therefore, a competent witness even to impeach the note which she has executed.

But it is said that a married woman who has an estate held in trust for her sole and separate use may bind such estate by giving her bond or note; and there are some authorities which go to this extent. From the time of Lord Hardwick down the English courts have been greatly troubled with the question as to the power of a married woman to charge or dispose of property settled to her own sole and separate use. In Parker *vs.* White, 11 Vesey, 209, Lord Elden said his mind was in great distraction on the subject.

In the Methodist Episcopal Church *vs.* Jacques, 3 Johns. Ch., 113, after a masterly review of all the authorities, Chancellor Kent concludes his opinion as follows: "I apprehend we may conclude (though I certainly do it with unfeigned diffidence, considering how great talents and

learning by a succession of distinguished men have been exhausted on the subject) that the English decisions are so floating and contradictory as to leave us the liberty of adopting the true principle of these settlements. Instead of holding that the wife is a *feme sole* to all intents and purposes as to her separate property she ought only to be deemed a *feme sole sub modo*, or to the extent of the powers clearly given by the settlement. Instead of maintaining that she has an absolute power of disposition, unless specially restrained by the instrument, the converse of the proposition would be more correct that she has no power but what is specially given and to be exercised only in the mode prescribed, if any such there be. Her incapacity is general, and the exception is to be taken strictly and to be shown in every case, because it is against the general policy and immemorial doctrine of law. These very settlements are intended to protect her weakness against her husband's power, and her maintenance against his dissipation."

It is true these views of the Chancellor were not sustained by the Supreme Court of New York in the same case on appeal, 17 Johns. R., 548. But in Lancaster *vs.* Dolan, 1 Rawle, 247, they received a most masterly vindication at the hands of Ch. Justice Gibson, in delivering the unanimous opinion of the Supreme Court of Pennsylvania, Lancaster *vs.* Dolan, 1 Rawle, 247, per Gibson, C. J.

"The conveyance is in trust 'to permit her to use, improve, occupy, possess, and enjoy and to receive all and singular the rents, issues and profits.' A use thus limited to any other than a married woman or *feme* in contemplation of marriage, would be executed, but it is immaterial whether the trust be to pay a married woman the profits, or to permit her to receive them, it being necessary to a separate provision that the legal estate should remain in the trustees to prevent the husbands from taking the profits and defeating the very object of the conveyance. 1 Saund. on Uses, 197. The estate of Mrs. Royes, therefore, is a trust, and without

any power of disposition being annexed to it in the deed. It has been insisted in the argument that such a power is an inseparable incident of the ownership.  Nothing in the law is more to be deprecated than those decisions in which the right of a *cestui que trust* to dispose of his estate has been recognized.  Every attempt to secure a provision for a spendthrift child must prove abortive while the trustees are bound to follow any disposition of it which he may make. It is still more unfortunate that as regards their separate estates *femes covert* have been regarded in equity as *femes sole*.  It has been justly remarked that if the principle be pushed to its extent, a married woman who has trustees will be infinitely more protected than if she were left to her legal rights.  There are instances of wives having been coaxed or bullied out of the protection provided, even at the instant when the settlement was before the Court of Chancery. Ought we then to follow this principle further.  The English decisions since the declaration of our independence have unsettled everything.  In some it has been held that the *feme* may exercise absolute dominion without an express power in the conveyance; in others, that she can exercise no power at all; and to this complexion they will, perhaps, come at last.  But it is agreed on all hands, that her power is not to be extended beyond her personal estate, and the profits of her land.  She has not in a single instance been allowed to lay her hands on the inheritance.  *  *  *  There is no instance of her having been permitted to dispose of freehold, except in pursuance of the terms of the trust, or by way of power over a use.  Peacock *vs.* Monk, 2 Vesey, 190 is expressly to the point.  An agreement to dispose of the profits of her real estate has been executed in equity, but in a latter case the Court of Chancery has refused to enforce a security on rents and profits, under similar circumstances.

*    *    *    *    *    *    *    *

In fine, notwithstanding the case of Newlin *vs.* Newlin, 1 S. & R., 275, which was hastily determined on an exception

to evidence, we are entirely prepared to adopt the conclusions of Chancellor Kent in M. E. Church *vs.* Jacques, 3 Johns. Ch. R., 108, that the English decisions are so floating and contradictory, as to leave us at liberty to adopt the true principle of these settlements; that instead of holding the wife to be a *feme sole* to all intents as regards her separate estate, she ought to be deemed so only to the extent of the power clearly given in the conveyance, and that instead of maintaining that she has an absolute right of disposition unless she is expressly restrained, the converse of the proposition ought to be established—that she has no power but what is expressly given."

In Dorrance *vs.* Scott, 3 Whart., 309, the same court held that the bond of a married woman, though she join in it with her husband, is absolutely void; and a judgment entered on such bond by virtue of a warrant of attorney annexed, executed by the wife together with her husband is also void as respects the wife, and her estate, and a judgment upon a *scire facias* issued on such judgment is also void as respects the wife and her estate.

In the present case, therefore, the wife was no party to the note in question, and the only obligation incurred was in procuring her trustee, Nailor, to execute the deed of trust to secure the payment of her husband's note. This she had the power to do by the terms of the settlement. The only liability she has incurred is in respect of her separate property and under terms of the deed of trust.

The rule then which prohibits a party who has signed and circulated a piece of negotiable paper from giving evidence to affect its validity is not applicable to Mrs. Keifer in this case.

In United States *vs.* Leffler, 11 Peters, 86, the court held that this rule did not extend to bonds, or any other than negotiable instruments.

The object of the present bill is to relieve this married woman's property from the burthen of usury for which it is

held as security. Her evidence was taken for this object only, and we think it was competent for that purpose. If its effects reach further, and destroy the note in whole, or in part, that is collateral and incidental only.

*Decree below reversed and sale enjoined upon the payment by complainant, on or before March 16, 1871, of $4,000 with interest from November 20, 1866, less certain admitted credits; failing which the bill to stand dismissed.*