## The ESTATE OF ESTHER BARTON.

The 19th section of the Act of the 29th March, 1832, makes no change in the legal relation of trustee and *cestui que trust*. It was intended simply to indemnify any trustee having moneys in his hands, the principal of which was to be paid in future, and the income to be paid away or to accumulate: if he invested such fund in some one of the securities designated in the act under the direction of the Court. The Act does not divest the trustee of any authority lawfully exercised under the instrument creating the trust. It leaves trustees clothed with special powers in regard to the investment of trust funds as it found them: responsible only for defaults arising from acts inconsistent with the terms of their charter; acts done without due and proper caution; or in violation of good faith.

Where a trustee continues the trust fund in the same securities in which the party creating the trust had placed them; and the party immediately interested in the fund treated the investment as unexceptionable, and when the investment is adopted, the credit of the institution was undoubted, and the most prudent and cautious persons placed their property there: he will not in general be held responsible if a loss occurred. Particularly where it is conceded he acted in good faith.

Where a trustee has paid over the annual receipts of the income of the trust fund without claiming a deduction for commissions, and repeatedly stated he did not intend to claim any, he will not afterwards be permitted to demand commissions, because the *cestui que trust* has excepted to his final account and endeavoured to surcharge the account.

A court of justice should throw no embarrassments in the way of apparently well grounded exceptions to the account of a trustee; but should always encourage a fair and just scrutiny of the same.

As a general rule, commissions on the principal sum coming into the hands of a trustee, and on the reinvestment thereof, will not be allowed; especially in those cases where the usual commission of five per cent. has been charged on the interest and profits derived from such investments.

Where the investments and reinvestments are made without any extraordinary trouble, the commission of five per cent. charged on the annual receipts of income, is an adequate compensation for the trustee's care and trouble, as well for making such reinvestments, as for receiving their income.

*Sept.* 10. THIS case arose in the Orphans' Court on exceptions to the report of an auditor settling the account of David Sargeant, a trustee for Esther Barton, who was created such trustee under the will of Elizabeth Sargeant, deceased.

All the facts necessary for a full understanding of the questions decided by the Court, are so clearly stated by the Judge who delivered its opinion, that it seems unnecessary to give any further statement in the report.

The opinion of the Court was delivered by

KING, President.—Mrs. Elizabeth Sargeant, by her last will, dated Nov. 5, 1835, bequeathed to David and Thomas Sargeant, $16,000 of her personal estate, in trust for the separate use of her daughter Esther Barton for life, remainder to Mrs. Barton absolutely, if she survived her husband, but in the event of her death during the life of her husband, the fund to be equally divided among Mrs. Barton's children in equal proportions. The trustees were invested with " the *full* and *uncontrolled* management of the said $16,000, so that the same might be invested in real or personal PROPERTY, or in such other way as they might think best." Among the assets were fifty shares in the Schuylkill Bank, valued in the appraisement of the effects of Mrs. Sargeant, at $3075, and $1800 in the Loan of the Lehigh Navigation Company. These sums Mr. David Sargeant, who alone accepted the trust, transferred to himself as trustee of Mrs. Barton; he being also executor of Elizabeth Sargeant. Instead of using the phrase transferred, it would be perhaps more accurate to say retained, in reference to the Schuylkill Bank stock, because, although the stock was the property of Mrs. Sargeant, it stood during her life and at her decease in the name of Mr. David Sargeant. The remainder of the trust fund was invested in good bonds and mortgages, which, being paid off by the mortgagors, was reinvested by the trustee, in city five per cent., and county six per cent. stocks. In the year succeeding the death of Mrs. Sargeant, differences appear to have prevailed between the trustee and *cestui que trust*, as to the continuance of that part of the fund which had been invested in mortgage securities, Mrs. Barton being anxious that the mortgages should be collected, and the amount secured by them employed in the purchase of the stock of the Bank of the United States, then just revived under a State charter. To this mistaken requisition, the trustee fortunately refused to accede, otherwise the losses Mrs. Barton has actually sus-

4 C

tained, would have assumed even a more disastrous character than they now unfortunately present. It seems from the report of the auditor, that Mr. Sargeant never made any claim or charge for commissions for the execution of this trust, but regularly paid over to his sister, Mrs. Barton, the full amount of the proceeds of her maternal legacy without deduction or demand of compensation. It is also reported that such a demand was not contemplated by Mr. Sargeant until the effort made in this proceeding to charge him with the depreciation which has since taken place in the value of the bank stock and Lehigh loan. The bank stock being absolutely annihilated, and the loan ruinously depressed, Mrs. Barton now insists that her trustee is liable for these losses, inasmuch as she supposes that he could only place or continue the trust fund in one of the securities indicated by law, viz. in the public debt of the nation, state, or this city, or in real security, with the approbation of this Court. The auditor, to whom the trust account was referred, has reported against this claim of the *cestui que trust*, and allowed the trustee a commission of $2\frac{1}{2}$ per centum on his reinvestments of the trust fund, amounting to $285.10, and a commission of 5 per centum on the amount of income received and paid over to Mrs. Barton, amounting to $187.47. He has also charged all the costs of the reference to the trust fund. To the entire action of the auditor, exception has been taken by Mrs. Barton; and whether he is to be sustained in whole or in part, is the matter for present adjudication.

From the subsisting condition of invested funds in this community, the question must sooner or later arise in this Court, whether, in regulating the relations of trustees, which peculiarly pertains to this jurisdiction, we will recognise any investment made by a trustee having no other or greater discretion than necessarily arises from his office, if made in any other than the funds in which by law this Court may, if applied to, direct such investment. This being a question involving important results, and operating on extensive interests, ought not, and will not, be decided, until it necessarily and directly arises. It does not do so in this case, which depends on its own peculiar circumstances. In the first place, by the terms of the instrument creating this trust, the trustee is clothed with the broadest discretion. He is to have "the full and uncontrolled management of the fund, so that the same may be invested in real or personal *property*, or in such other way as he may think best." In the second place, the Schuylkill Bank stock and Lehigh loan were securities selected by the testatrix herself, being

part of the very estate which came into the possession of the trustee as her executor. And in the third place, so far from the *cestui que trust* being dissatisfied with this investment, in a letter addressed by her to the trustee, dated Nov. 7, 1836, she requests him to leave " the Schuylkill Bank stock and Lehigh loan, which yield good interest as now invested." This last circumstance is only incidentally referred to as bearing on the good faith in which these investments were made and continued by the trustee, and is so far important. It is not relied upon as validating that which would otherwise have been a breach of trust, which, it seems, the assent of a feme covert or infant *cestui que trust* cannot effectuate: Lewin on Trusts, 640; Lancaster *v.* Dolan, 1 Rawle, 247.

To justify us in holding this trustee under these circumstances responsible for the depreciation of these stocks, we must go to the full extent of the doctrine contended for—that, however broad may be the discretion given to a trustee as to investing a trust fund, he can only be indemnified from loss by selecting, under the directions of this Court, one of the funds designated by the Act of the 29th of March, 1832, § 14. The Act works no such change in the legal relation of trustees. It was intended simply to indemnify any trustee having moneys in his hands, the principal of which was payable in future, and the income to be paid away or accumulated, if he invested such fund in one of certain designated securities under the direction of this Court. It was not intended to divest him of any authority lawfully exercised under the terms of the instrument creating the trust. This is shown by the proviso of the Act, which declares that " nothing contained in it should authorize the Court to make an order contrary to the direction of any will or other instrument in regard to the investment of such moneys." It was intended specially to embrace a large class of cases in which no direction is given by the instrument creating the trust, *how* the trust fund shall be invested; such as the general direction, so common in country wills, to " put out money at interest." This is also shown by the words of the law, in which it is said, that a trustee so investing under the order of this Court, " shall be exempted from all liability for loss, in the same manner as if such investment had been made *in pursuance of directions in the will or other instrument creating the trust.*" The Act was intended as a substitute for special directions as to investment in the trust instrument; not as a supersedeas of full and express authority given by a testator or grantor. It leaves trustees clothed with special powers in regard

to the investment of trust funds as it found them—responsible only
for defaults arising from acts inconsistent with the terms of their
charter; acts done without due and proper caution; or in violation
of good faith.    These are the tests by which the doings of Pennsyl-
vania trustees are to be tried.    The English Courts of Equity have
certainly established strict rules on the subject of trusts, especially
of infants' money, and generally required that trust funds should
be invested in government securities.    But this rule has not been
universal, particularly in cases where investments have been made
according to the practice of the party creating the trust, 4 Johns. C.
Rep. 284, or where express power is given to invest on personal secu-
rity by the terms of the trust: Lewin on Trusts, 155; 24 Law Lib.

The financial policy of a nation loaded with a permanent debt, in
sustaining the credit of which, all men of property are directly in-
terested, may be one of the elements which induces in England so
decided a leaning towards confining trustees' investments to govern-
ment securities.    Such securities there are always at the command
of purchasers.    In this state the case is different.    There have been
happy periods in our history in which national or state securities
did not exist; and, consequently, trustee investments could not have
been made in them.

Trying the continuance of the investments complained of by the
test rule furnished, it seems quite clear that the auditor rightly
refused charging the trustee with the consequences of their depre-
ciation.    The power to invest was without stint or limitation.    It
extends to real or personal *property* (a stronger phrase than secu-
rity), " or in such other way as he may think best."    Was due cau-
tion and circumspection used in the exercise of this authority?
which certainly this and every other trustee, no matter how unlimit
ed his authority, is bound to employ in making trust investments.
To this inquiry also an affirmative answer must be given.    First,
because he continued the trust funds in the same securities in which
the party creating the trust had placed them.    Second, because
the party immediately interested in the trust fund, while she object-
ed to some of the investments, specially treated these as unexcep-
tionable.    Third, because at the time these investments were adopted,
their credit was undoubted, and the most prudent and cautious
persons unhesitatingly placed their property in them.    In regarding
the question of due diligence and caution in making the investments,
all these considerations are of value; and taking them together,
laches is not fairly chargeable to this trustee.    Nothing has been

said in reference to the good faith in which the trustee has acted, this being conceded on all hands. The exception to the auditor's report, which complains of his refusing to charge the trustee with the losses on the bank stock and loan, is dismissed.

On the question of commissions, I do not agree with the auditor, either as to amount or principle. Commissions on reinvestments ought to be carefully awarded. If too freely given, they afford, in a trustee with large discretion, great temptations to repeated changes of the securities of the fund. No such disposition appears in this case; but still, as a general observation, this is plainly true. $2\frac{1}{2}$ per cent. on such a reinvestment as took place in this case is greatly too large a commission. Purchases of city and county stocks are made through brokers who, for $\frac{1}{4}$ of one per cent., make the purchases, obtain the transfers, and pay over the price to the vendor. Now to allow a trustee $2\frac{1}{2}$ per cent. on such reinvestments, in addition to the usual brokerage, is too severe a tax on the trust fund. If called upon now to fix a standard of compensation to a trustee for investments so simple and free from care or responsibility, I would say 1 per cent. came nearer accuracy than $2\frac{1}{2}$. But in this case the Court is not called upon to fix a standard; because we are of opinion that this trustee is not entitled to claim commissions, either on the reinvestments, or on the receipts and payments of the income of the fund; and for these reasons: the trustee always paid over the full amount of the income to Mrs. Barton, neither deducting nor claiming commissions in any form, until the difference arose between them as to the depreciated investments. Again, it is stated in the report, apparently as a conceded fact, that the trustee never intended to make such a claim; and was only induced to do so by the effort made to surcharge him with the losses on the stocks. This effort, in the opinion of the auditor, authorized a charge which, independent of it, neither party seems to have contemplated. But, in our opinion, where trustee and *cestui que trust* have, for a series of years, dealt together on the principle that no commissions were to be charged for the services of the former, it is inadmissible for the trustee subsequently to set up a charge for a full compensation, because differences may have arisen between himself and his *cestui que trust*, as to the mode of administering the trust fund. If such a demand had been made in the first instance, the *cestui que trust* might have resisted the *sum* claimed: she might have succeeded in placing the trust in equally secure, and less expensive hands: she might have asked no further intervention of her trustee in the

receipt of her income than his power of attorney to herself to collect it.   In brief, the mutual understanding betweem them, and the security which it created in the *cestui que trust*, was such that it would be inequitable now to permit it to be changed by one, to the injury of the other, because of matters of posterior occurrence, having no connexion with it.   Hereafter, if Mr. Sargeant continues to execute the trust, Mrs. Barton has notice that he will demand the usual compensation.   The fact of Mrs. Barton's resisting the trustee's account, and of her seeking to charge him with the depreciated securities, on which the auditor seems to rest, as authorizing the charges for commissions, presents to us no sufficient predicate for such a conclusion.   Such a doctrine would inflict a penalty as a consequence of asserting what was believed a right, and that too on a class of suitors, the special objects of the guardianship of a Court of Equity.   It would intimidate such suitors from a scrutinous examination into the accounts of trustees, which it is the clear policy of the court not to discourage, by holding *in terrorem* over them, a liability to such a charge as the consequence of a too curious examination of the accounts of trustees.   The safer doctrine seems to be that where, by a mutual understanding between *cestui que trust* and trustee, the latter waives commissions, he shall not be permitted to revive them, except on notice to the *cestui que trust*, which is only to operate in future.

Under all the circumstances, the Court consider the expenses of the audit properly chargeable to the trust fund.   Neither party has entirely succeeded.   The trustee has prevailed in resisting the chief item of the claim of Mrs. Barton, the investigation of which must have principally produced the expense incurred.   Besides, the result of our decision has made Mr. Sargeant a gratuitous trustee, and one on whom costs should be visited only in a clear case.   And such is not this.   So much of the auditor's report as credits the trustee with the sum of $473.17, the aggregate of the commissions claimed, is disallowed, and that sum directed to be carried to the credit of the trust fund.   In other respects the report is confirmed.

### In the Case of the Trustees of MARIA HEMPHILL.

On the 23d February, 1848, the question of commissions on investments and reinvestments again came before the Court.   KING, President, delivered the unanimous opinion of the Court, which is in substance as follows:—As a general rule, commissions on the principal sum coming into the hands of a trustee, and on the reinvestment thereof, will not be allowed; particularly where the usual commissions

of 5 per cent. have been charged on the interest and profits derived from such investments. Commissions and brokerage, and all other usual expenses paid by them, are properly chargeable to the estate. But where the investments and reinvestments are made without any extraordinary labour or trouble, the commission of five per centum charged on the annual receipts of income is an adequate compensation for the trustee's care and trouble, as well for making such reinvestments as for receiving their income.

There may arise cases in which, from their specialties, this general rule should not be applied; but these must always be regarded as exceptions.