## RICHARD LEAYCRAFT v. FRANCES S. HEDDEN.

A *feme covert* is regarded in equity as a *feme sole*, in respect to her separate estate, so far as to enable her to dispose of it in any way not inconsistent with the terms of the instrument under which she holds.

If by the deed of settlement the husband has relinquished any right which he might have acquired in her estate by the marriage, and covenanted not to intermeddle therewith, but to permit the wife to dispose of it by deed, will, or otherwise at her pleasure; her right of disposition remains as it was before the marriage, and she is, in respect of the estate, *feme sole*.

But if the terms of the deed require a particular mode of disposition, those terms must be observed. Her power is limited by them, and she is *feme sole sub modo*, and only to the extent of the power expressed.

Where by the deed of settlement it is stipulated that the wife shall be permitted to make what disposition of the trust property she may choose, and that she may have the entire and absolute control over it, and dispose of the same by deed, will or otherwise, at her pleasure, and the trustee covenants to *convey* the said estates and property as she shall direct; *Held*, that the term *convey* must have been used as well in reference to the personal as to the real estate, and a direction by the *feme* to her trustee to execute a bond, may in equity be regarded as an appropriation of so much of the estate as may be necessary to pay it.

If a bond be executed pursuant to the direction of the *feme covert*, by her trustee, in his own name, her separate estate may be charged with the money due on the bond.

And if the trust be surrendered, and her separate estate held with her general property, so that no means of distinguishing it is afforded to the court, a general decree will be made against her for the payment of the money due on the bond.

THE bill states that on the first of August, eighteen hundred and thirty-nine, Frances S. Hedden, then the wife of Z. Hedden, since deceased, was, and for many years had been, in her own name, or in the name of some person in trust for her,

[Leaycraft v. Hedden.]

seized and possessed of valuable real and personal property in her own right, and to her own separate and individual use, secured to her during her coverture by an ante-nuptial contract, in the words or to the effect following, that is to say: " This indenture, made the twenty-sixth day of May, eighteen hundred and twenty, between Z. H. of the first part, S. W. late S. B. of the second part, and J. W. B. of the third part:   Whereas, a marriage is about to be had and solemnized between the said Z. H. and the said S. W. late S. B.; and whereas the said Z. and the said S. have mutually agreed that the said Z. shall not interfere or meddle with her present or acquired property, whether real or personal, and that the said S. W. be permitted to make what disposition of the said property she may choose :  Now this indenture witnesseth, that the said Z. for and in consideration of the said marriage, hath covenanted, promised and agreed, and by these presents doth covenant, promise and agree to and with the said J. W. B. his heirs, executors, administrators and assigns, that he the said Z. will not interfere with the present or future acquired property, whether real or personal, of the said S.; and that she, the said S. may have the entire and absolute control over the said property, and dispose of the same by deed or by will, or otherwise, at her pleasure : and the said S. by and with the consent of the said Z. doth hereby release, assign and transfer to the said J. W. B. his heirs and assigns, all her estate, real and personal, whatsoever and wheresoever the same may be, in trust, to permit her the said S. to receive the rents and profits thereof to her own use, as the same shall from time to time accrue and be receivable, and devise the same by any will or testament she may choose to make; and further in trust that he, the said J. shall and will, at her request, convey the said estate and property to such further or other uses as she may by writing under her hand direct and appoint."

That the said Frances S. Hedden, on the said first day of August, eighteen hundred and thirty-nine, was interested in a lease of a lot of land in the city of New-York, and the com-

plainant had loaned and advanced to the said Frances S. Hedden, or to others for her, and at her request, large sums of money, amounting to five thousand five hundred dollars, with which she had erected valuable buildings and improvements on said lot; that the term of years for which the said Frances S. Hedden held the said lot having expired, M. A. S. the owner in fee of the said lot, executed a new lease thereof for the term of twenty-one years, to R. M. W. the son-in-law and trustee of the said Frances S. Hedden; that the said R. M. W. took and held the said premises, in trust for the said Frances S. Hedden, without having any individual personal interest, and as evidence of such trust, executed to the said Frances S. Hedden a declaration of trust, wherein, among other things, he did declare and make known that he held the said premises " in trust, to permit her, the said Frances S. Hedden, to receive the rents, issues and profits thereof to her own use, as the same shall from time to time accrue and be received, and also to devise the same by any will or testament she may choose to make; and further in trust that I, the said R. M. W. shall and will at her request convey the said estate and property, or any part thereof, to such further and other uses, as she may by writing under her hand direct and appoint."

That on the said first of August, eighteen hundred and thirty-nine, the said Frances S. Hedden, in order to secure to the complainant the sum of five thousand five hundred dollars, loaned and advanced by him as aforesaid, made and executed to the complainant, under her hand and seal, an instrument in writing, whereby, after reciting the lease of the said premises to the said R. M. W. in trust for her, the said Frances S. Hedden, and her indebtedness to the complainant as aforesaid, she, the said Frances S. Hedden, for the purpose of securing to the complainant the repayment of the said sum of five thousand five hundred dollars, with interest at seven per cent. per annum, did direct and empower the said trustee, R. M. W. to execute to the complainant his bond or obligation for the said sum of five thousand five hundred dollars, with interest thereon at seven per

cent., the interest·payable half yearly, and the principal to be-come payable on the first of August, eighteen hundred and forty ; and as a further security, to execute and deliver to the complainant a mortgage upon the said lot, to carry interest from the date of the said instrument, thereby ratifying and confirming whatever her said trustee should lawfully do by vir-tue thereof.

That on the said first day of August, eighteen hundred and thirty-nine, the said R. M. W. in pursuance of the said power and in execution thereof, made to the complainant his bond of even date, in the penal sum of eleven thousand dollars, condi-tioned for the payment to the complainant of the sum of five thousand five hundred dollars, with interest as aforesaid, and also a mortgage upon the said leasehold premises.

That the said trustee died about the year eighteen hundred and forty, and that Zadock Hedden, the husband of the said F. S. H. died in the year eighteen hundred and forty-one; that on the death of the said Zadock Hedden, the whole trust was sur-rendered to the said Frances S. Hedden, being then sole and un-married, and that she is now seized and possessed of the same in her own right ; that during the continuance of the said trust, as well during the life of her husband Z. H. as since, the said Frances S. Hedden has managed and controlled in person the said mortgaged premises, and treated the same as her individ-ual and separate property, and until the summer of eighteen hundred and forty, personally paid the interest accruing on the said bond and mortgage to the complainant.

That in order to recover the principal and interest due on the said bond and mortgage, the complainant, by virtue of a power contained in the said deed and mortgage, and pursuant to the laws of the state of New-York, sold the said leasehold premises and became himself the purchaser for the sum of three thou-sand dollars ; that after deducting the ground rent in arrear, and the costs of the sale, there remained about the sum of two thou-sand one hundred and sixty dollars to be credited on the com-plainant's bond ; and that there still remains due him upon said

bond a balance of three thousand six hundred and sixty dollars and eighty cents, with interest at seven per cent. from the first of November, eighteen hundred and forty-one.

That at the time of making the aforesaid loan of five thousand five hundred dollars by the complainant to the said F. S. H. she was seized and possessed in her own right of divers other tracts of land, standing in the name of the said trustee, the principal part whereof are situated in this state; and that the said Frances S Hedden is still seized and possessed of real and personal property standing in her own name, or in the name of some other person to her use.

The bill insists that the said Frances S. Hedden is liable in equity for the payment of the balance remaining due to the complainant on account of the money loaned to her as aforesaid, for her own and for the benefit of her separate estate, and for which he took the bond and mortgage of her trustee.

The bill prays an account of the sum due to the complainant, with interest, according to the tenor of the said bond and mortgage, and that the defendant may be decreed to be personally liable therefor, and to pay the same to the complainant, together with his costs at law and in equity.

The answer admits the ante-nuptial settlement, and the execution of the several instruments set out in the bill of complaint; but states that the said R. M. W. purchased the said leasehold premises on or before the first of June, eighteen hundred and thirty-five, with his own means and for his separate and individual use and benefit; that the sum of four thousand five hundred dollars was loaned by the complainant to the said R. M. W. to pay for the said premises, and that the said R. M. W. gave his individual bond and mortgage to secure the repayment thereof; that the said R. M. W. for the purpose of making some improvements upon the said premises, borrowed of the complainant, in the year eighteen hundred and thirty-five, the further sum of one thousand dollars, and gave him his individual bond therefor; that the said premises were owned and occupied by the said R. M. W. in his own individual right,

[Leaycraft v. Hedden.]

until the year eighteen hundred and thirty-eight ; that the said R. M. W. being indebted to the defendant, she took an assignment of his interest in the said premises, for the purpose of securing her debt ; and that she was subsequently induced, by the advice of the complainant and of the said R. M. W. for the same purpose, to renew the said lease, without intending or designing to make herself personally liable.

Denies that the complainant made a loan to her for the purpose of erecting buildings or improvements on her separate property ; or that any part of such loan was used for that purpose.

Denies that any loan was made by the complainant for her separate use and benefit, or upon the credit of her separate estate ; and that as far as these statements are made in the recitals of any instrument signed by her, such recitals are false and fraudulent ; and the said instrument was signed by her without a knowledge or examination of its contents, and without being aware that it contained such recital.

The cause came on for final hearing upon bill, answer, replication and proofs.

*P. D. Vroom,* for complainant.

*L. H. Sandford,* for defendant.

Brief of defendant's counsel.[*]

First. The bill rests upon two allegations of matters of fact, viz. : 1. That the complainant made a loan to the defendant for the purpose of erecting buildings and improvements on her separate property, some part of which loan was used for that purpose. 2. That the loan was made for her separate use and benefit, and upon the credit of her separate estate.

[*] T e eporter is indebted to the politeness of Mr. Sandford for full notes of his argument. The brief is published entire, as it contains an able examination, and a lucid review of the authorities upon an important question, which has given rise to much discussion and conflict of opinion. He regrets that he has been unable to procure the brief of the complainant's counsel.

44

Neither of these allegations is sustained by the proofs in the cause. The answer positively denies them both; and it being responsive to the bill, it must be overcome by two witnesses, or by one positive witness and circumstances which are equivalent to another: *Neville* v. *Demeritt*, 1 *Green's Chan.* 322, 335; *Stafford* v. *Bryan*, 1 *Paige*, 239; 3 *Wend.* 532.

There is no positive witness against the answer. The complainant relies upon the recitals contained in the power to the trustee, Williams, authorizing the execution of the mortgage, in August, eighteen hundred and thirty-nine, and in the two declarations of trust.

The first delaration is not proved to have been delivered to the defendant, or brought to her knowledge. The entry of the register of deeds in New-York, that it was recorded at the request of S. Hedden, is not part of the record, and his certificate of that fact is not evidence. This has been so decided in New-York. The recitals in both declarations of trust are inconsistent with the allegation in the bill, that the money was lent to Mrs. Hedden to efect the buildings and improvements; and inconsistent with the proof, which is positive, that the four thousand five hundred dollars was lent to Williams, not to improve the property, but to buy it. Besides, the testimony leaves no room to doubt, that the recital of Mrs. Hedden's indebtedness in the power to Williams, (and which is the only testimony in the case to charge her with the original loans,) was fraudulently inserted in that instrument, without her knowledge, and certainly without her suspecting its object, or the use to which it was to be perverted.

At the most, they are mere admissions made by a married woman, ignorant of their effect, without the aid or advice of her husband, her trustee, or her counsel; which are not shown to have been read to or by her before execution, and which are proved to be untrue by positive and unequivocal testimony. And independent of the weight of the answer, the testimony on the part of the defendant is fully sufficient to overbalance the force of the admissions, and all the testimony on the part of the complain-

[Leaycraft v. Hedden.]

ant. [In support of these positions, the counsel went into a minute examination of the pleadings and testimony in the cause.]

Further, the case made by the testimony is wholly variant from that made by the bill. For if there be any debt proved against the defendant, it is a debt incurred in eighteen hundred and thirty-five, and not in or about eighteen hundred and thirty-nine; and it was incurred for the purpose of buying the lot in question, not for the purpose of improving or benefiting property already belonging to the defendant. The bill as framed, therefore, cannot be sustained : *Knickerbacker* v. *Harris,* 5 *Wend.* 638, 646.

Second. If, however, the court shall come to the conclusion that the loan in question was made to Mrs. Hedden, then I submit that on the case proved by the complainant, he is not entitled to any decree.

I. By the laws of New-Jersey, (according to which laws this suit is to be determined,) a married woman is incapable of entering into contracts or obligations, except such as are prescribed by statute. And in respect of her separate estate she can act as a *feme sole,* only in the manner and to the extent prescribed in the trust instrument creating such separate estate.

(1.) As to her general incapacity there is no question. She cannot make a valid note, bond or covenant. In short, she cannot contract obligations : 2 *Story's Eq.* 625, *s.* 1397 ; *Whitbeck* v. *Cook,* 15 *Johns.* 483.

If the defendant had made a contract, the complainant might have sued her at law in assumpsit, as she was unmarried when this suit was commenced.

(2.) Then to what extent is a married woman's legal capacity enlarged, when she has a separate estate, and how far may she act in regard to it as a *feme sole ?*

I of course confine my argument to an estate which, by virtue of some will, deed or settlement, is set apart for her sole use, with certain powers of enjoyment and disposal. Her property not thus settled, being subject to the marital rights of the husband, stands upon its original common law footing.

[Leaycraft v. Hedden.]

· I insist, that as the law is in this state, she can act as a *feme sole* in respect to her separate property, only to the extent and in the manner and form provided in the instrument creating it.

First, it is so upon reason and principle. Let us look at the history of the law on this subject.

· In the early period of the English common law, property consisted so exclusively of real estate, that personal property was scarcely mentioned. The year books are filled with real actions, the very names of which now sound uncouthly to our ears; and while there are occasional actions of tort, those upon contract are of rare occurrence.

. In this period, we find the common law on the subject of husband and wife clearly ascertained. The wife's legal existence was merged in that of the husband. If she had an estate of inheritance, it became his during her life, or his own, dependent upon issue of the marriage.

But as a compensation for this state of things, the husband was bound to maintain her; on his death she resumed the whole of her own estates, and became entitled to dower in his lands; and during the coverture, the law clothed her with an entire incapacity to contract, not merely with her husband, but with all others. She could not execute any valid deed. Her title to lands, and her inchoate right of dower, could only be conveyed or barred by a fine or common recovery, and upon a private examination before one of the judges of the highest courts in the kingdom. It was necessary for the husband to join in these assurances, else they were nugatory. A jointure was open to both parties, but that was in lieu of dower, and created a safe and certain provision for the wife. It was the only marriage settlement then known.

Such was the common law, and as such it became a part of the law of this state. It is still the law here, except as modified by the statutes of the state, and by the clearly defined changes which had been made by the English courts from time to time, prior to the revolution in seventeen hundred and seventy-six.

To proceed in the illustration. The commercial prosperity

[Leaycraft v. Hedden.]

of England dates from the reign of Henry VII. and from that time to James I. its steady and rapid increase had brought into existence a vast amount of personal property; and the subsequent unexampled advance of England in wealth, has made personal estate nearly equal in value to the landed property of the kingdom.

The common law, originating when personalty was in effect of no moment, gave all the wife's goods and chattels to the husband.

During this commercial progress, the growth of uses, and the introduction of trusts on the destruction of equitable uses, (the wife taking no dower in either,) had further abridged her marital rights. And the greatly increased facilities for barring dower, and cutting off her inheritance, in part, through the multiplication of officers to take the wife's acknowledgement on fines and recoveries, had left her still more exposed to being despoiled of her estate.

These causes led to the introduction, in the seventeenth century, of marriage settlements, and provisions in wills, which vested property in trustees, for the sole and separate use of the wife, with various provisions for the mode of its use and disposal.

Their object was to provide a sure and indestructible support for wives and children, which could not be influenced by the casualties, misfortunes or attainder of husbands.

Not, as some recent cases in England and New-York would import, for the mere purpose of guarding the wife from the husband's influence; and at the same time depriving her of his protection in the transfer of her property, and of all those incapacities which the law had provided for her security against her own improvidence, unacquaintance with business and liability to fraud, imposition and undue influence.

As a species of trust, the separate estates of married women became a subject of equitable cognizance. The courts of law only looked to the trustee and the legal title.

The trust instruments invariably, as in this case, provided in
44*

[Leaycraft v. Hedden.]

accurate and well considered terms, the mode of enjoyment, and the manner in which the married woman might act upon, direct, appoint and control the property.

And the courts have uniformly held that they cannot act upon the wife's disposition of such property, or upon any writing or thing affecting it, as a contract or an agreement, but only as an equitable appointment under the settlement.

It is therefore plain, that the possession or ownership of a separate estate, does not confer on the wife the right to contract. She stands as at common law, incapable of making a contract or general engagement. She has a mere power of disposition, as incident to such estate, which operates only by way of appointment. And thus operating, how can she direct or appoint, in a mode other than that prescribed?

Her whole capacity to act upon the separate estate, is derived from the deed. How then can the law give to her a greater or different capacity than the deed itself expresses? The only reasonable ground of decision is, that as this whole artificial capacity is the creature of the trust instrument in each case, and in derogation of the old common law rule; equity will permit a married woman to act as a *feme sole* to the extent prescribed and required by such instrument; and in all other respects, and to all other intents, will leave her to the protection, as well as to the restrictions, of the common law.

The learned counsel for the complainant assumed, without citing any authority, that by the law as now established, the defendant's separate estate is liable for the debt claimed. It is conceded that no such decision has ever been made in the courts of this state. It is therefore an open question here, to be settled upon equitable principles, unless there be some controlling authority derived from the English law prior to the revolution.

II. This brings me to consider the point upon authority. It is undeniable that the balance of the recent decisions in England, and the New-York authorities, go to the extent of sustaining the case as made by the bill in this cause.

I will endeavor to satisfy the court that the English decisions

are not controlling, and that the balance of judicial authority is clearly adverse to the New-York adjudications.

Until lord Thurlow decided the case of *Hulme* v. *Tenant*, in seventeen hundred and seventy-eight, the law on this point was unsettled and fluctuating in England; and for forty years after that decision it was much questioned, and the law of that case for many years, wholly denied.

The deviation there from what I deem the only consistent rule, commenced with lord Macclesfield, in *Powell* v. *Hankey*, 2 *P. W.* 82, in seventeen hundred and twenty-two. And it there rests more in the dictum of the judge, than the decision: for he refused to sanction the wife's disposition of the principal of her separate estate, although she had an absolute power of appointment. He held that she should not recover back from her husband's estate, the interest on her property which she had allowed him to receive, and that it might be deemed as used for her maintenance. The temper of this judge towards these benign provisions for wives and children, may be learned from his remark that it was against common right for a wife to have a separate property, and all reasonable intendments and presumptions were to be admitted against her.

In the next case, *Norton* v. *Turvill*, 2 *P. W.* 144, in seventeen hundred and twenty-three, the bond of the wife, though held to be void as a bond, was enforced by the master of the rolls, after her death, against the husband who had possessed himself of her property. It would seem also, that the wife by will made a trust to pay debts. That decision has no application here.

There are several other reported cases, from seventeen hundred and twenty-eight to the time of *Hulme* v. *Tenant*, where the court refused to decree arrears of pin money, and of other income, to the wife, where the husband had received or retained it, at the same time supporting the wife out of his own means.

These cases were generally strained against the wife, from a feeling adverse to these separate estates; which feeling at this day appears strange and unaccountable.

I pass over the various *dicta* of chancellors and masters of the rolls, as being of no authority. We are now looking at decisions.

In *Standford* v. *Marshall*, 2 *Atk.* 69, the decision charged the income, by way of appointment. In *Clerk* v. *Miller*, 2 *Ibid*, 379, the same judge would not charge the wife on her parol promise.

*Allen* v. *Papworth*, 1 *Vesey sen.* 163, was an appointment of the profits merely, and made on a bill of the wife seeking it. On the other hand, in *Blackwood* v. *Norris*, *Cas. Temp. Talbot*, 43, cited, the court would not decree a fund to be paid to the husband, on the wife's consent in open court, it being her separate personal estate.

In *Grigby* v. *Cox*, 1 *Vesey, sen.* 517, the decree went as far as to hold the wife to perform a contract of sale of part of her trust estate; yet these stopped short in the middle of the principle established; for although she had other trust estates, the court would not compel her to charge on those a dower right existing on the one sold, and which was in the way of making a clear title.

In *Paulet* v. *Delaval*, 2 *Ibid*, 663, the decision was on the ground of the wife's confirmation, after she became sole.

In *Caverley* v. *Dudley*, 3 *Atk.* 541, the grant of an annuity was held beyond the wife's power, yet it was upheld as a loan to her.

These were all the reported decisions made in England, prior to the American revolution.

And I submit, that they utterly fail to establish the doctrine that the wife, in respect of her separate property, could deal with it as a *feme sole*, without regard to the mode prescribed in the trust instrument.

The cases are vacillating, inconsistent upon the very principles which they assert, and accompanied with repeated declarations of the judges, tending still farther to limit their effect.

For these, especially as to the power over her real estate, I refer to lord Hardwicke's observations, in *Hearle* v. *Greenbank*,

[Leaycraft v. Hedden.]

1 *Vesey, sen.* 298, 303 ; *Peacock* v. *Monk*, 2 *Ibid*, 190 ; and *Paulet* v. *Delaval*, 2 *Ibid*, 668, 669.

I will speak of the subsequent current of decisions presently.

I now repeat that we have reached the period when the English decisions ceased to be authority, (properly so called,) in this state ; and find no settled law which will sustain the case made by the bill in this cause. And there is no adjudged case charging the *corpus* of the wife's real estate with a debt incurred by her.

Now how stands this question on the weight of judicial authority, as *res integra* here.

And first, as derived from English jurisprudence. We have seen lord Hardwicke going to a great length, *haud passibus æquis*, however ; for he hesitated, and at times drew back.

In *Hulme* v. *Tenant*, 1 *Bro. C. C.* 16, which is the great English decision in the complainant's favor, lord Thurlow charged upon the rents and profits of the wife's separate leasehold estate, the amount of a bond which she had signed with her husband. He refused to charge even the income of her separate freehold estate. His predecessor, lord Bathurst, had decided against any charge.

It will be seen that this case is no authority for charging the principal of the wife's estate ; but is directly opposed to such a charge.

Lord Thurlow's doubts as to the whole doctrine, were apparent in *Ellis* v. *Atkinson*, 3 *Bro. C. C.* 347, *note, and p.* 565. And finally, in *Pybus* v. *Smith*, 3 *Ibid*, 340 ; *S. C.* 1 *Vesey*. 189, he expressed his opinion freely and strongly against the extent to which the cases had been carried. See lord Eldon's account of it, in 8 *Vesey*, 175, and 11 *Vesey*, 221.

Then we have lord Alvanley and lord Rosslyn, at a later period, holding the contrary doctrine, and deciding that the power of appointment must be strictly pursued.

These decisions were *Sockett* v. *Wray*, 4 *Bro. C. C.* 483 ; *Hyde* v. *Price*, 3 *Vesey*, 437 ; *Milnes* v. *Busk*, 2

*Ibid*, 488 ; *Whistler.* v. *Newman*, 4 *Ibid*, 129 ; and *Mores* v. *Huish*, 5 *Ibid*, 692.

So that immediately after lord Thurlow's time, and for a period of fourteen or fifteen years, the doctrine of the English chancery was entirely against the law claimed in this bill.

Lord Eldon was clearly and emphatically against the doctrine contended for; although he seemed finally to consider it as having been sustained so often, as to be established.

Thus, in *Sperling* v. *Rochfort*, 8 *Vesey*, 175, he said it was impossible to know the result on the cases decided; that he wished the law might turn out for the protection of married women, to the extent in which it was represented by lord Rosslyn, in *Whistler* v. *Newman*.

In *Nantes* v. *Corrock*, 9 *Vesey*, 188, 9, he says that *Hulme* v. *Tenant* was "a prodigiously strong case;" and *Pybus* v. *Smith*, was also a very strong case, and a decision much against lord Thurlow's inclination. And he says lord Thurlow went no further than the rents, not against the estate itself, and clearly not against her person.

In *Jones* v. *Harris*, 9 *Ibid*, 497, lord Eldon speaks of it as an open question, and gives good reasons why the law should be as we contend it is.

In *Parkes* v. *White*, 11 *Ibid*, 220, 221, he says his mind is in great distraction on the subject. That upon principle a woman contracting marriage, loses all the powers she had as a *feme sole*. And lord Thurlow said that upon true principle, where equity allows her by contract, to place herself in the situation of *feme sole*, her faculties as such, the nature and extent of them, are to be collected from the terms of the instrument making her such.

Sir William Grant's views may be seen in *Wagstaff* v. *Smith*, 9 *Ves.* 520; and *Richards* v. *Chambers*, 10 *Ibid*, 580. And even that most able equity jurist was led by the misty and confused state of the law, growing out of the departure from principle, established in *Hulme* v. *Tenant*, to make directly conflicting decisions upon the wife's disposition of dividends on

stock, in *Hovey* v. *Blakeman, cited* 9 *Ves.* 524; and in *Sturgis* v. *Corp*, 13 *Ibid*, 190.

But I conclude, that the rule came finally to be settled in England, since the date of the cases cited, that in equity, in respect of her separate estate, the wife may act as a *feme sole*, unless restricted by the instrument creating it. But such act, to be effective, must be in writing, and importing an obligation to pay; and operates as an appointment, and not as a contract.

It is needless to review the more recent cases establishing these doctrines. They never have received the sanction of the bar in England. See Mr. Belt's *Note* 1, *to* 1 *Bro. C. C.* 17.

Mr. Clancy, in his treatise on the *Rights of Married Women, p.* 341, &c., after stating the rule, declares that his own opinion is against any change being permitted, unless the writing expressly appoints it to be paid out of, or charged upon, her separate estate.

Mr. Roper, and his learned editor, Mr. Jacob, were evidently of the same opinion: 2 *Roper's Husband and Wife, by Jacob,* 243, *note.*

And some very recent decisions of the vice-chancellor of England, upon the provisions introduced into settlements in England, in order to obviate as far as practicable the injurious effect of these decisions upon the interests of married women, have drawn out the strong and open animadversions of the profession. See 6 *London Jurist, part* 2, *page* 263 ; 8 *Ibid, part* 2, 382.

The gross inconsistency of the rule as established there, is strikingly shown by this illustration.

Where the wife attempts to execute the express powers contained in the settlement, whether by deed or will, she must pursue the terms and formalities prescribed, to the very letter. And the house of lords has just decided there, on a writ of error, against the validity of such an appointment attempted to be made, pursuant to a power, because it did not purport to be attested by her in the presence of two credible witnesses, (the settlement prescribing that form of attestation,) although two

persons had signed as witnesses in the ordinary way : *Burdett v. Doe*, 8 *Lond. Jur. Reports*, 1.

Yet in the same court, if the wife had signed a bond without her trustee or her husband's assent, although an utter nullity of itself, it would have been held a good appointment, and if large enough, have swept her whole estate.

Next, in the state of New-York. The question came before chancellor Kent, in *Jacques* v. *Methodist Episcopal Church*, 3 *John. Chan. R.* 77; who, after a most able and thorough examination of the authorities and the principles applicable to the point, held, that a *feme covert*, in respect of her separate property, is to be considered as a *feme sole*, only to the extent of the power given to her by the marriage settlement.

The decree of this most learned and upright judge was reversed by a large majority of the court, in the court for the correction of errors, 17 *John.* 548; and to the extent of the facts involved, she was held enabled to act as a *feme sole*. As this decision is the foundation of all the law to this effect, which is found on this side of the Atlantic, I beg to dwell upon it somewhat at large.

The case was this. Jacques married a lady of large estate, who had been accustomed to an expensive style of living. Previous to the marriage, her property was settled in the usual form, to her separate use, and with absolute power of appointment by deed or will. During the coverture, she required the same style of living to be kept up; her husband paid those expenses, and she suffered him to receive and appropriate to his use, some portions of her income, and one considerable item of the personal property settled upon her. On her death she left no issue, and appointed one third of her property to the Methodist church, one third to her husband, Jacques, and one third to her collateral relatives. The contest in the suit, arose upon the claim of Jacques to retain what his wife had bestowed upon him in her life-time.

Having in view the constitution of the court of final resort in the state of New-York, many of the judges being laymen; it

is not unjust to infer that the peculiar circumstances of that case, had a decisive influence upon the result. Indeed, we find the chief justice himself adverting to those circumstances in strong terms, (*p*. 581,) and speaking of the extreme hardship of throwing upon Jacques the charge of his wife's expensive equipage and establishment. We see also a spice of lord Macclesfield's hostility to these inventions of equity, in the opinions of the chief justice, and of judge Platt. The former confesses that his partialities in favor of marriage settlements, are not strong. He thinks the iron rule of the common law, the best adapted to promote the tranquillity and happiness of the married state.

Judge Platt is still more emphatic in his administration of the lethean despotism of the old rule of law, and he laments over the introduction of marriage settlements, and the "amphibious character" thereby given to the wife, (*page* 583.)

I will not pursue the remarks of that judge, which, I say it with regret, are creditable neither to his head or his heart.

I can say with confidence, that having in view the peculiar hardship of that case, the constitution of the court itself, and the powerful hostility of the two judges who read opinions, to the whole system of marriage settlements; it ought not to be deemed an authority, out of New-York, as against the unanswerable judgment of chancellor Kent.

The decision in *Jacques* has been followed, in that state, in the *North American Coal Company* v. *Dyett*, 7 *Paige*, 9, and recognized in *Gardner* v. *Gardner*, 7 *Ibid*, 115.

Chancellor Walworth, of course, assumed the case of *Jacques* to be settled law, and decided the case of *Dyett* accordingly, without any examination of the subject upon principle. I apprehend that if he had adverted to two considerations, viz. that the case of *Jacques* was one of administration after the death of the wife, (see 2 *Story's Eq. s.* 1898, *note* 1,) and that few even of the modern English cases, had gone the length of charging the capital of the wife's real estate; he would have come to a different conclusion.

45

[Leaycraft v. Hedden.]

At all events, chancellor Walworth has not given the sanction of his own judgment to the principle involved in the final decision of *Jacques* v. *The Methodist Church.*

Therefore, when this honorable court shall look to the state of New-York for authority on this point, it will find on one side the decision of the court of errors, and on the other the great and decisive weight of chancellor Kent's judgment in the same case. And that he still entertains the same opinion, see 2 *Kent's Com.* 164 *to* 166, 2d *edition.*

In answer to the narrow views expressed by the common law judges in *Jacques's case,* in 17 *Johnson,* I beg to refer to portions of chancellor Kent's opinion in the same case when before him, in 3 *John. Chan. R.*

At page 88, he says, " These marriage settlements are made to secure to the wife, and her offspring, a certain support in every event, and to guard her against being overwhelmed by the misfortunes, or unkindness, or vices of the husband. They usually proceed from the prudence and foresight of friends, or the warm and anxious affection of parents. If fairly made, they ought to be supported, according to the true intent and spirit of the instrument by which they are created ; and I am very unwilling to admit that, notwithstanding the cautious language of this settlement, the wife was to be deemed to have absolute dominion over the property as a *feme sole,* and not bound by the prescribed form of disposition.

"A court of equity will always carry the intention of these settlements into effect, when that intention is explicit and certain. The court will not suffer the grant to be defeated, or the intention of the settlement to fail. This is the general principle that pervades the cases, however discordant they may be in the application of their doctrines, or however perplexingly subtle in their distinctions. Now, if the meaning of the settlement in this case was, that the wife could only dispose of her estate, real or personal, by deed or will, or bar herself of the rents, issues and profits, by her receipts, how can the court uphold the husband in setting up a parol disposition, or gift ?"

Again, " if the instrument contains a prescribed form of disposition, I do not see why it is not as available as if the deed contained a proviso against any other mode of disposition ; it is a question of intention and construction, merely."

At page 90, he says, " the intention evidently was, in this, as it is in most other cases of property settled to a married woman's separate use, that the interest should be unalienable, except in the mode provided. Then why should not the court give effect to that intention? There is no sufficiently uniform and unruffled current of authority to prevent it."

He says, lord Thurlow admits, again and again, that the wife has no power over the estate but what the instrument gave her ; and this is a doctrine, intelligible, just and sound. And he asks, " why then may we not decide according to sound principle, and place the rights of the wife on a safe and durable foundation ?" A question which is humbly, but most emphatically addressed to this court, where the point is open, and where every consideration of justice in the particular case, prompts your excellency to sustain chancellor Kent's decision.

Finally, at page 113, the chancellor concludes thus : " I apprehend we may conclude (though I do it with unfeigned diffidence) that the English decisions are so floating and contradictory, as to leave us the liberty of adopting the true principle of these settlements. Instead of holding that the wife is a *feme sole*, to all intents and purposes, as to her separate property, she ought only to be deemed a *feme sole sub modo*, or to the extent of the power clearly given by the settlement. Instead of maintaining that she has an absolute power of disposition, unless specially restrained by the instrument, the converse of the proposition would be more correct, that she has no power but what is specially given, and to be exercised only in the mode prescribed, if any such there be. Her incapacity is general ; and the exception is to be taken strictly, and to be shown in every case, because it is against the general policy and immemorial doctrine of law. These very settlements are intended to protect her weakness against her husband's power, and

her maintenance against his dissipation. It is a protection which the court allows her to assume, or her friends to give, and it ought not to be rendered illusory. The doctrine runs through all the cases, that the intention of the settlement is to govern, and that it must be collected from the terms of the instrument. When it says she may appoint by will, it does not mean that she may likewise appoint by deed; when it permits her to appoint by deed, it cannot mean, that giving a bond, or note, or a parol promise without reference to the property, or making a parol gift, is such an appointment. So, when it says that she is to receive from her trustee the income of her property, as it from time to time may grow due, it does not mean that she may, by anticipation, dispose at once of all that income. Such a latitude of construction is not only unauthorized by the terms, but it defeats the policy of the settlement, by withdrawing from the wife the protection it intended to give her."

The whole case of *Jacques* will, I doubt not, receive a careful examination, and I therefore refrain from further quotations.

In one other state, Alabama, that case as finally decided, has been followed, so far as to charge the wife's separate estate with a debt incurred for her use and the use of such estate, and for which the note or bond of the husband and wife was executed to the creditor; *Forrest* v. *Robinson*, 4 *Porter's R.* 44; *Sadler* v. *Houston, Ibid*, 208.

On the other hand, in several of the states, (the decisions of the courts in which are held in the highest estimation abroad,) and in all the other states in which the question has been examined upon principle, the decisions have corresponded with that of chancellor Kent.

First in order of time, it received a most elaborate examination by the chancellors in South Carolina, in *Ewing* v. *Smith*, 3 *Dess. Eq. R.* 417, 453, 455, 462, in February, eighteen hundred and eleven.

There a large estate was secured to the wife by settlement, to be for her sole and absolute use, on her surviving, and subject to her appointment by will.

The debt was a joint bond of husband and wife, with the sanction of one trustee, given for goods supplied for the use of the family, and in part for the use of the trust property. (For negroes, &c. See *p.* 464.)

It was agreed by all the judges, to be a separate estate, and as subject to disposal, as if in her possession.

Chancellor Dessaussure decreed payment out of the separate estate, on a bill, after the husband's death. This was reversed by the court of appeals.

See the clear and convincing opinion of chancellor Waties, (for thirty years an eminent judge in South Carolina,) at *p.* 456.

Chancellor Gaillard, in a short opinion, says, "the decree below was conformable to the late English decisions, but the case is *res integra* in this country, and to sanction the principle in the extent it is laid down in those decisions, would be to defeat the great object of marriage settlements, the protection of the property for the wife and children."

Chancellor Dessaussure retained his opinion, feeling controlled by the English cases. And one other chancellor concurred with him; but the levity of his short opinion detracts much from its respectability.

This decision has been adhered to ever since, in South Carolina.

I should mention, that a case of *Carter* v. *Eveleigh*, reported in 4 *Dess.* was decided before that of *Ewing* v. *Smith*, and was referred to by chancellor Dessaussure, in his opinion in the latter case.

In *Watson* v. *Cheshire*, 1 *McCord's Chan. R.* 233, 241, there was an attempt to charge the separate estate of the wife, with the amount of a note which she had signed with her husband, for his debt. The court held that her estate was not bound.

In *Magwood* v. *Johnston*, 1 *Hill's Chan. R.* 228, 231, the same doctrine was held as in *Ewing* v. *Smith*, and the latter decision approved.

In *Robinson* v. *Dart's Executors*, C. W. *Dudley's Eq. R.*

45*

128, 131, in eighteen hundred and thirty-eight, the principle was again applied, that the wife has no right to charge or dispose of her separate estate, even with the consent of her husband and trustee, unless it is otherwise provided by the terms of the settlement. Chancellor Harper says, that *Ewing* v. *Smith*, has been followed ever since; and in reference to *Hulme* v. *Tenant*, he says, in this respect the English decisions seem to make an exception to the general doctrine.

In eighteen hundred and forty, in the case of *Clark* v. *Makenna, Cheves' Eq. R.* 163, all the previous cases in South Carolina were approved. There, on a trust by which the wife's separate property was made expressly liable for her own debts and contracts, it was charged with a debt of her's, contracted for necessaries. The chancellor says, that the power over the separate estate must be derived solely from the instrument conferring it.

In Pennsylvania, the question arose in *Lancaster* v. *Dolan*, 1 *Rawle*, 231, where the wife, having a separate real estate, for her sole use for life, and with no clauses restraining her disposition of it, mortgaged it with her husband, the mortgage reciting that it was for their joint debt. The court decided against the charge, and held that a *feme covert*, in respect of her separate estate, is to be deemed a *feme sole*, only to the extent of the power clearly given by the instrument by which the estate is settled, and has no right of disposition beyond it. The judgment of the court was unanimous.

Chancellor J. Gibson says, the English cases since our declaration of independence, have unsettled everything; and that they had better retain the old principle. That he is unwilling to follow the case of *Jacques* v. *The Methodist Church*; and that the English cases are so floating and contradictory, as to leave them at liberty to adopt the true principle of those settlements. And that she has no power but what is expressly given.

So in Tennessee. It was decided in *Morgan* v. *Elam*, 4 *Yerger's R.* 375, in eighteen hundred and thirty-three, that

[Leaycraft v. Hedden.]

the power of a married woman over her separate estate, does not extend beyond the plain meaning of the deed creating the estate; and she is therefore to be considered a *feme sole*, in relation to the estate, only so far as the deed has expressly conferred on her the power of acting as a *feme sole*.

And when a particular mode or manner is pointed out for the disposition of the separate estate of a married woman, she cannot dispose of it in any other way.

The English, New-York and South Carolina cases were examined, and the court held the above points, after a very full and able argument at bar, and by the judges.

Judge Green, *p*. 445, says, "if these marriage settlements are supported at all, they ought to be supported according to their plain sense, and the manifest intention of the grantor. That it is a mockery to talk about supporting a conveyance, and at the same time give it such a construction as will allow a disposition to be made of the estate, which it was the manifest intention of the grantor to guard against." He says of judge Platt's argument in the case of *Jacques*, 17 *John*. 583, "that it is as defective in morals, as it is in sound legal principles." And see chief justice Catron's opinion, at *p*. 450.

The same point had been previously decided in the court of chancery in Tennessee, in the case of *Brantley* v. *Brantley*. See 4 *Yerger*, 447, 450, 451, where it is cited.

To these authorities against the rule of the late English cases, I may safely add the opinion of Mr. justice Story, and of chancellor Bland, in Maryland. See 2 *Story's Eq. sec*. 1400; *Helms* v. *Franeiscus*, 2 *Bland's Chan. R.* 562.

Now, I submit with the utmost confidence, that the vast preponderance of judicial authority, is decisively and strongly against extending to a wife having a separate estate, any power as a *feme sole*, other than that expressly granted by the instrument creating the estate.

In England, we have the great names of Thurlow and Eldon, of Bathurst, Alvanley and Loughborough, with the uni-

form expression of the profession, against the doctrines of Macclesfield and Talbot, and the uncertain policy of Hardwicke.

In New-York, the powerful authority of chancellor Kent stands opposed to two common law judges, carrying with them their peculiar court of last resort.

Alabama has followed, reposing on that decision; while the courts of Pennsylvania, South Carolina and Tennessee, investigating the question on principle, have steadily held to the contrary opinion.

To these add the judgment of judge Story and chancellor Bland, and the whole presents a most imposing array of legal character and authority in favor of the rule of common sense, and the only rule which can carry out the benign intents of these invaluable provisions for the widow and the orphan.

Why should a different rule be adopted in New-Jersey?

You will not suffer a married woman to part with her freehold, except with the assent of her husband, and on a private examination before an officer. You permit her friends to make what they fondly deem, a more secure and infallible provision for her, by means of a settlement and a separate estate. With what reason or justice can you declare that she may charge, aliene and destroy that provision, without the knowledge or sanction of her husband, or even her trustee, and in virtual defiance of the mode of disposal which the settlement prescribes?

If such be the law, then, indeed, in the language of one of the judges whose opinion I have quoted, are these settlements a mockery. Nay, they are worse; they are a delusion and a snare, by which, under the garb of entire protection, the rights of the wife are deprived of the safeguards of the common law, and exposed to the pillage of the artful, and unprincipled speculators. They rob her of the benefit of her husband's counsel in dealing with strangers, and leave her, unaided and friendless, to all the impositions so commonly practised on the confiding and unwary.

And to accomplish all this, you are asked to discard all well settled principles of law. You are to establish as a rule, that if

[Leaycraft v. Hedden.]

a married woman with a separate estate, contracts a debt, the law must imply that she intended to pay it out of such estate, and construe it into an appointment accordingly; although the instrument declares she shall only appoint, by writing under seal. And yet, as if frightened with the consequences of so bold a proposition, you are to stop short, when half way in its application, and refuse to make any debt or appointment which is not evidenced by a writing, importing an obligation to pay. No reported case has yet gone the length of establishing a charge short of such a writing, and many cases have expressly decided against it. Yet the moment you lose sight of the mode of appointment prescribed in the trust instrument, and suffer the wife to act in respect of the separate estate, regardless of that mode, there is no reason or principle that will not give effect to her parol and implied engagements, as well as to those in writing and in express terms.

The only way of avoiding these inconsistencies, and the impracticable subtleties of the English cases on the subject, is steadily to adhere to the legal and reasonable ground which I have attempted to sustain; and to hold that equity, in enlarging the capacity of a married woman in respect of her separate estate, proceeds exclusively upon the basis of the powers conferred on her by the deed or will creating it, gives effect to such powers, and to those alone, and in every other respect leaves her under the disabilities of the common law. Equity is called upon to interfere by such deed or will, and to the extent of such powers; and it would be an assumption, almost an usurpation, to interfere beyond the powers themselves.

III. The trust in Mrs. Hedden's marriage settlement, limited her control over the estate to two specified modes of appointment, viz. by her last will and testament, and by a writing under her hand directing and appointing a conveyance.

The trustee was to convey the property pursuant to such a writing, and in no other manner. And she could in no other manner convey or control it.

She was to be permitted to receive the rents and profits to her

own use, and those only from time to time, as they accrued; so that she could not, even by that appointment in writing, anticipate them.

But as to the principal, the *corpus* of the estate, she was powerless, except in the two prescribed modes. If she had died without any will or appointment, her estate would have gone as if no settlement had been made.

The previous paragraph in the instrument, by which her husband covenanted, contains no grant of power. The operative words are those contained in the declaration of the trusts; and those I have stated.

Thus the expressed intention of this settlement plainly and unequivocally forbids such a disposal of the estate as that attempted to be enforced in this suit.

If I am sustained in my second point, the court will have no occasion to go further.

IV. If, however, the court shall deem it proper to adopt the extreme doctrines of the New-York and modern English cases, still the complainant does not bring his case within the principles established.

1. The whole extent of the case made by the recitals and proof which form the complainant's evidence, is simply a loan of five thousand five hundred dollars to Mrs. Hedden, without any express promise to pay.

The testimony is conclusive, that four thousand five hundred dollars of it was borrowed to pay for the purchase of the leasehold. And as to the rest, the proof is not clear; and as the complainant claims, it only shows a loan of one thousand dollars to improve the property bought with the loan of four thousand five hundred dollars.

Therefore it is not proved that any of the five thousand five hundred dollars went for the benefit of Mrs. Hedden's separate estate; or that any of it was lent upon the credit of any of such estate, or upon the the credit of any estate, save the premises mortgaged.

The most latitudinarian cases yet decided, require proof of

one or the other. A mere general debt, has never been made a charge.

For this law I refer to chancellor Walworth, in the case of *Dyett*, before cited, 7 *Paige*, 9, and in *Gardner* v. *Gardner*, 7 *Ibid*, 116, 119. Also, *Clancy's Rights of Women*, and 2 *Story's Eq. s.* 1398.

(1.) As to the loans being for the benefit of her property.

The separate estate existed fifteen years before the loan. It was specific, and there was no provision for reinvestment.

The leasehold bought by Williams, the trustee, with the money lent, was no part of such estate, and could not benefit it. It was a speculation, an adventure, not authorized by the trust, and which could not be grafted upon it.

It is absurd to say, that a loan to her trustee, or even to herself, for the purpose of speculating in real estate never before owned by her, was for the use of her separate estate.

The case of *Magwood* v. *Johnson*, 1 *Hill's Ch. R.* 228, shows that to make a charge on that ground, the loan or debt must be to promote the objects of the trust.

The one thousand dollars lent to improve the speculation is no different, because the whole affair was unwarranted and not within the trust, and the complainant was cognizant of the whole.

(2.) There is no such thing as a personal liability, resting on a married woman by reason of her acts in reference to her separate estate; or on her other property which was not within the trust or a part of such separate estate: 2 *Story's Eq. s.* 1397 ; *Jones* v. *Harris*, 9 *Vesey*, 486 ; *Lee* v. *Muggeridge*, 1 *Ves. and Beames*, 118.

(3.) The whole liability ever set up against her, is against her separate estate, as such ; and operates, not as a contract, but as a direction or appointment of the estate : 2 *Story's Eq. s.* 1399, 1401 ; *Field* v. *Sowle*, 4 *Russell*, 112 ; *Tullett* v. *Armstrong*, 7 *Lond. Jur. Rep.* 601, 603.

(4.) It follows that there must be an express charge upon the estate, or one implied from the nature of the liability : 2 *Story's*

*Eq.* 627, *s.* 1399. We have seen that here none can be implied from the application of the loan.

(5.) The only express charge in this case is the mortgage, and limited to the leasehold purchased with the loan. And the very fact of taking an express and specific lien on that property, entirely repels and precludes the idea of any implied charge on other property. If any other were intended, it would have been taken, and the other property relied upon, included in this or another mortgage.

(6.) No charge upon the separate estate of a married woman has ever yet been implied, except from some writing signed by her, and importing an agreement to pay, and which can only be carried into effect upon her separate estate.

This appears abundantly by the authorities: 2 *Roper's H. and Wife. by Jacob,* 235, 238, 243, note. In *Duke of Bolton v. Williams,* 2 *Vesey,* 138, and *Jones v. Harris,* 9 *Ibid,* 486, it was illustrated clearly. The attempt to create an express charge for annuities failed, because of some statutory defect, and the argument was, that the wife had acknowledged the receipt of money, and had shown in writing an intention to charge it upon her separate estate. The court, in each case, decided against the charge.

So in *Gardner v. Gardner,* the wife was joint guardian with her husband, and she had received and spent certain moneys of the ward. When she and her husband were removed from the trust, this deficiency was paid out of her separate estate. Yet she, as administratrix of her husband, was allowed, as against his next of kin, to take that amount from his assets.

If such is the doctrine in New-York, where the courts have proceeded so far on this subject; we surely may expect its application in this case, where there is no written charge, no promise to pay, not even a recognition of a debt, except in the direction to specifically secure it by a mortgage.

In *Tullett v. Armstrong,* 7 *London Jur. R.* 601, 603, July fifth, eighteen hundred and forty-one, lord Langdale, master of

the rolls, held the point precisely in the language which I have stated, and refused to charge the separate estate.

(7.) A loan to a married woman, without her writing for its payment, stands upon the same footing as any general debt made by her. Her general debts are not a charge upon her separate estate.

I refer to the cases last cited, and *Clancy*, 341, &c.; 2 *Story's Eq. s.* 1398 *and* 1400.

Judge Story there says, that her separate property is not in equity liable for the payment of her general debts, or her general personal engagements. And that it is now expressly established, that such property cannot be charged with her general pecuniary engagements.

(8.) The separate estate of Mrs. Hedden was and is exclusively real estate. And no direction or appointment of hers could affect or incumber it, unless it were in writing, and signed by her, as required by the statute of frauds.

It is to operate as a charge or lien, and this creates a direct interest in lands, if it be availing at all: *Elmer's Digest*, 216, *s.* 14, act of November, 1794; 2 *Roper*, 243 *n. and* 244 *n.*; *Nantes* v. *Corrock*, 9 *Ves.* 182; *Peacock* v. *Monk*, 2 *Ves. sen.* 190, where lord Hardwicke decided that the wife's separate real property was not bound. And see also *Hearle* v. *Greenbank*, 1 *Ibid*, 298, 303; and *Paulett* v. *Delaval*, 2 *Ibid*, 668, 669.

(9.) In this case, assuming the debt to have been Mrs. Hedden's, the complainant took from her a mortgage on the property and Williams's bond. No obligation to pay would rest upon a *feme sole* borrowing money, and thus securing it; and Mrs. Hedden can be no worse off than if she had been *sole*.

The whole mortgage was given in the state of New-York; and without an express covenant to pay, or a bond, the mortgagee is confined to the lands mortgaged for his remedy: *Salisbury* v. *Phillips*, 10 *John.* 57; 1 *Rev. Statutes of N. Y.* 738, *s.* 139, declaring the law, and extending it to grants.

The loan here was on the credit, solely and exclusively, of the mortgaged premises. And the authorities on the ques-

46

[Leaycraft v. Hedden.]

tion. are decisive, that you cannot imply an intention to charge one property, where there is an express intent shown to charge other property. See 2 *Roper*, 236, 7; and the annuity cases before cited, in 2 *Ves.* 138, *and* 9 *Ibid*, 486.

Here it is precisely as if Mrs. Hedden had taken a deed of the lot to her trustee, subject to a prior mortgage.

No case has ever charged a married woman with an implied assumpsit of a debt; still less of a debt previously contracted. Such was this debt, as indisputably proved by the answer and testimony. Instead of its being proved that the loan was made on the credit of Mrs. Hedden's separate estate, the contrary is proved, that it was a loan for speculation.

On no ground of principle, on no adjudged case, on no authority of text books or treatises, can this claim be maintained. There is not even a *dictum* in its favor, in the numerous reported decisions on the subject.

V. It is a maxim of this court, that he who seeks equity must do equity, and the court will not lend its aid upon any other terms to a party invoking it.. See *Rogers* v. *Rathbun*, 1 *John. C. R.* 367; *Fanning* v. *Dunham*, 5 *Ibid*, 142; *Livingston* v. *Harris*, 3 *Paige's R.* 532.

The complainant has gone into possession of the lot mortgaged, which is proved to be worth more than the whole sum due to him, after deducting the rents he has received.

He claims to have foreclosed, and that he can call upon Mrs. Hedden for a deficiency of four or five thousand dollars, and retain the lot also. His foreclosure, as proved, is an *ex parte* proceeding, unknown to the law of this state. And what is more essential, he has omitted to allege in his bill, and to prove, that he has thereby cut off the equity of redemption.

The court, in so oppressive a case as this is, if sustained, will gladly lay hold of this circumstance to do exact justice, and will give to Mrs. Hedden an opportunity to redeem the premises, as a condition of subjecting her to the liability claimed by the bill.

The complainant will ask nothing more, if his object is to

obtain his debt, with the interest, and not to compass an un-righteous speculation.

VI. The bill should be dismissed with costs.

If, however, the court shall decide against the defendant throughout, the proper decree will be for an account of the amount due, which was advanced for the benefit of her separate estate, and of the property which she had at the commencement of the suit, which was her separate estate when the mortgage was executed.

THE CHANCELLOR. By an ante-nuptial deed, dated May twenty-sixth, eighteen hundred and twenty, between the defendant, then Frances Susannah Watkins, of the one part, and Zadock Hedden, her intended husband, of another part, and Joseph Watkins Bostwick, of the third part; wherein it is recited, that the said Susannah and Zadock had mutually agreed that the said Zadock should not interfere or meddle with her present or future acquired property, whether real or personal; and that the said Susannah should be permitted to make what disposition of the said property she might choose; the said Zadock covenanted that he would not intermeddle with the then present or future acquired property, whether real or personal, of the said Susannah; and that she might have the absolute control over the said property, and dispose of the same by deed, will, or otherwise, at her pleasure. And the said Susannah, by and with the consent of the said Zadock, thereby released, assigned and transferred to the said Joseph Watkins Bostwick, his heirs and assigns, all her real and personal estate whatsoever, and wheresoever the same might be, in trust, to permit her, the said Susannah, to receive the rents and profits thereof to her own use, as the same should from time to time accrue and be receivable, and to devise the same by any will or testament she might choose to make; and further in trust that the said Joseph should and would, at her request, convey the said estates and property to such further and other uses as she might by writing under her hand and seal, direct and appoint.

[Leaycraft v. Hedden.]

After the execution of the deed, the marriage was duly solemnized between the parties, then resident in this state.

On the first of May, eighteen hundred and thirty-seven, Robert M. Williams, the son-in-law of Mrs. Hedden, and who had before then become her trustee under the ante-nuptial deed, by a declaration of trust, reciting that certain leasehold premises in the city of New-York had been conveyed to him, but the purchase money thereof paid by Mrs. Hedden, out of her separate estate held under the trust deed, declared that he held the said leasehold premises in trust for her, pursuant to the terms of the deed.

Previously to this time, Robert M. Williams had incumbered the premises by a mortgage executed to the complainant, on the first of June, eighteen hundred and thirty-five, for four thousand five hundred dollars; and by another mortgage to the complainant, on the third of August, eighteen hundred and thirty-five, for one thousand dollars. In August, eighteen hundred and thirty-nine, the lease of the premises having expired, a new lease of the same was taken by the said Williams, by consent of Mrs. Hedden, and a new declaration of trust executed by him to her, declaring that he held them in trust for her, and without any individual interest in himself, reciting that the premises had for some years belonged to her, and were purchased out of her separate estate.

On the same day, by her appointment duly signed and sealed, reciting that Williams held the premises in trust for her, and that she was indebted to the complainant in the sum of five thousand five hundred dollars for money by him theretofore loaned to her, "for the purpose of securing to the said Richard Leaycraft the repayment of the said sum of money, with the interest to grow due thereon," she directed and empowered her trustee to execute to the complainant a bond for the said sum of money; and as a further security, to make, execute and deliver to the said Richard Leaycraft a mortgage upon the said premises. In pursuance of this appointment, Williams executed to

[Leaycraft v. Hedden.]

the complainant the bond and mortgage now the subject of this controversy.

On the seventh of October, eighteen hundred and forty-one, the premises were sold under the mortgage last mentioned, pursuant to the statute of New-York, and bought by the complainant for three thousand dollars.

For the residue of the mortgage money, the complainant now files his bill and seeks to compel the payment of it by the defendant.

The husband of the defendant is deceased, the trust surrendered, and she alone is made party defendant.

In her answer, the defendant denies that the premises were purchased with her money, or that she ever borrowed any money of the complainant upon those premises. She denies that the first declaration of trust was made by reason of her having been the purchaser; but that Williams, having become indebted to her in the sum of one thousand dollars, for money lent by her to him, the first declaration was made to assign to her the leasehold property, to secure in whole or in part the money so lent to Williams; that the recitals therein were false and fraudulent, and unknown to her.

There is a conflict between the allegations of the answer and the testimony, upon this point, without entering into which, I deem it sufficient in settling the facts upon which the case must rest, to inquire into the validity of the last declaration of trust, and the power of appointment made simultaneously therewith.

The defendant admits that the new lease was made by her consent, and for her benefit, but by the advice and influence of the complainant and her son-in-law, Williams; and that the declaration of trust was also made with her consent, and the deed of appointment executed by her; but that the recitals therein were false, and unknown to her, she confiding in them and signing and accepting any paper that her trustee requested.

In reply to this, it is alleged and appears, that the declaration

46*

and appointment were drawn by Nicholas Dean, at the request of Mrs. Hedden, and subscribed by him as a witness, and according to his testimony, that no unfair means were used to procure her execution of the appointment; and that both papers were put on the record by him, at her request; but he does not remember whether they were read over to her or handed to her to read before execution.

The deed of appointment was acknowledged by the defendant, and the declaration of trust by Williams, before a commissioner of deeds, according to the statute of New-York, on the same day, the twenty-fifth of September, eighteen hundred and thirty-nine, and both placed upon the record at the same time.

It would hardly do to stamp this transaction with fraud, and to involve in its turpitude, the complainant, the scrivener and the trustee, who was the confidential friend and son-in-law of the defendant. They told her that the papers were correct and proper to carry out the arrangement to which she had agreed, and from which she was to derive a benefit; and they unquestionably were so.

She intended to have the lease renewed for her own advantage, and to assume the payment of the prior incumbrance; and even if the recital of her prior indebtedness to the complainant for money loaned to her, were false, yet there was sufficient inducement and consideration for her to direct the bond and mortgage to be made to the complainant.

It is probable that she supposed the premises sufficient to satisfy the mortgage; and when she suffered herself to be persuaded to direct its execution, if there were no fraud or undue means used, she became as much indebted to the complainant, as if she had originally directed the money to be borrowed.

I must therefore regard the declaration of trust, the deed of appointment, and bond and mortgage, as duly executed.

The question then is, were they so made under the antenuptial deed as to charge the separate estate of the defendant other than the mortgaged premises?

One of the most vexed and embarrassing questions raised in the court of chancery, is that which relates to the power of disposition by a *feme covert* of her separate estate.

On the one hand it has been held that a *feme covert* is to be regarded in equity as a *feme sole*, with respect to her separate estate, with power to dispose of it at her pleasure, without the consent of her trustee, unless specially restrained by the instrument under which she acquires the estate. On the other, that she is to be considered *feme sole*, to the extent only of the power given to her by the marriage settlement; that her power of disposition is not absolute, but *sub modo*, to be exercised according to the mode prescribed in the instrument under which she acquires the estate.

Accordingly, in support of the first proposition, we find, that as early as the case of *Norton* v. *Turvill*, 2 *P. Wms.* 144, decided by the master of the rolls in seventeen hundred and twenty-three, it was held, that although a bond made by a married woman was void, and not actionable at law, yet the demand could be supported in equity, so as to charge her separate estate. The execution of the bond was regarded as an appointment, disposing of so much of the estate.

This case was followed by a series of decisions of the succeeding chancellors, in accordance with it, to the year seventeen hundred and ninety-three, with the single exception of that of lord Bathurst; who dismissed the bill in the case of *Hulme* v. *Tenant*, reported in 1 *Bro. C. C.* 16.

On a re-hearing of the case, lord Thurlow sustained the bill, which was filed to charge the separate estate of a married woman, consisting of freehold and leasehold estates conveyed to trustees, to receive the rents and profits to her separate use, and to convey the estate to such use as she should appoint by deed or will under her hand and seal, or in default of appointment, to her heirs and executors. The husband had borrowed the money, and he and his wife joined in two bonds to secure its payment. On an examination of the cases, his lordship concluded that the proper rule was laid down in *Peacock* v. *Monk*, 2 *Ves.*

*sen.* 190, decided by lord Hardwicke in seventeen hundred and fifty-seven; "that a *feme covert* acting with respect to her separate property, is competent to act in all respects as if she were *feme sole.*"

In *Peacock* v. *Monk*, here referred to, lord Hardwicke said, that as to personal estate, where there is an agreement between husband and wife before marriage, that the wife should have to her separate use the whole or a particular part of her personal estate, she may dispose of it by an act in her life, or by will, as she pleases, although nothing is said of the manner of disposing of it.

In *Pybus* v. *Smith,* 3 *Bro. C. C.* 340, by lord Thurlow, in seventeen hundred and ninety-one, the same doctrine was held; and it was there added, that, "if a parent wished to give a portion to his daughter in such way that she could not aliene it, he saw no reason why it could not be done. But such intention must be expressed in clear terms."

In the year seventeen hundred and ninety-three, the court, observing the facility with which married women charged their separate estates for their husbands, with a desire to protect them, endeavored to restrain the power. And in *Sockett and Wife* v. *Wray et al.,* 4 *Bro. C. C.* 483, sir R. Pepper Arden refused to sanction a transfer to the husband of the property of the wife, held in trust, to pay her the interest during her lifetime, and after her decease to such person as she should by deed from time to time or by will appoint. He said there was a restraint in the case, and she could only dispose of it by a revocable act, a will.

The rule, after this, seemed to be unsettled and fluctuating, when considered in the cases that follow, viz.: *Hyde* v. *Price,* 3 *Vesey,* 437; *Milnes* v. *Busk,* 2 *Vesey,* 488; *Whistler* v. *Newman,* 4 *Vesey,* 129; *Mores* v. *Huish,* 5 *Vesey,* 692; *Sperling* v. *Rochfort,* 8 *Vesey,* 164; *Rich* v. *Cockell,* 9 *Vesey,* 369; *Jones* v. *Harris,* 9 *Vesey,* 497.

And the rule so remained unsettled, until lord Eldon, in *Parkes* v. *White,* 11 *Vesey,* 209, declared that it was important that the question should be settled once for all; that his mind

was in great distraction on the subject; and added, "if it be asserted that lord Thurlow, following his predecessors as far back as the doctrine can be traced, repeatedly decided upon this principle, and that the court has now a right to refuse to follow it; I am not bold enough to act upon the assertion." He placed the case upon the principle of *stare decisis*, and went back to the old rule. And the cases which have since arisen in England, have followed the same rule.

In the *Methodist Church* v. *Jacques*, 3 *John. Chan.* 113, after a very elaborate review of the English decisions, chancellor Kent concluded, that they were so floating and contradictory as to leave him at liberty to adopt what he considered the true rule of these settlements. That instead of holding that the wife is a *feme sole* to all intents and purposes, as to her separate estate, she ought only to be deemed a *feme sole sub modo*, or to the extent of the power clearly given by the settlement.

This case was reviewed in the court of errors, and the decree reversed, and the English rule adopted. Mr. justice Platt, in delivering the opinion of a large majority of the court, comes to the conclusion, that the *jus disponendi* of a married woman over her separate property by virtue of the deed of settlement, (by which the property was held in trust to permit her to hold and enjoy the same, and to receive the rents, not subject to the control, debts or intermeddling of her husband, but to her only use, benefit and disposal,) was absolute and entire; and that she was competent to dispose of it, not only for her own use and pleasure, but could give it to her husband in such manner as she might have done if he had not been her husband; with the difference only, that as between husband and wife, courts will scrutinize the transaction with a jealous eye, in order to protect the wife from undue influence.

In *Ewing* v. *Smith*, 3 *Dess.* 447, chancellor Dessaussure, after reviewing with great care all the English authorities upon this question, says, " The result then is, that a *feme covert* entitled to a separate estate in possession, remainder or reversion,

is held to be a *feme sole* to the extent of her separate property, and the *jus disponendi* follows of course."

But the opinion of this learned chancellor shared the same fate with the opposite opinion of his erudite brother of New-York, and was reversed in the appellate court.

In *Lancaster* v. *Doland*, 1 *Rawle*, 231, the wife having a separate real estate for her sole use for life, with no clauses restraining her disposition of it, mortgaged it with her husband, the mortgage reciting that it was for their joint debt. The court decided against the charge, and held that a *feme covert*, in respect of her separate estate, is to be deemed a *feme sole* only to the extent of the power clearly given by the instrument by which the estate is settled, and has no right of disposition beyond it.

In *Morgan* v. *Elam*, 4 *Yerger's Term Rep.* 375, (in eighteen hundred and thirty-three,) it was held that the power of a married woman over her separate estate does not extend beyond the plain meaning of the deed creating the estate, and she is, therefore, to be considered a *feme sole* in relation to the estate only so far as the deed has expressly conferred on her the power of acting as a *feme sole.* And when a particular mode or manner is pointed out for the disposition of the separate estate of a married woman, she cannot dispose of it in any other way.

Judge Green, on page 445, remarks, If these marriage settlements are supported according to their plain sense and the manifest intention of the grantor, it is a mockery to talk about supporting a conveyance, and at the same time give it such construction as will allow a disposition to be made of the estate which it was the manifest intention of the grantor to guard against.

I am not aware that this question has ever been judicially considered in New-Jersey ; and in the midst of such a conflict of opinions, it is clear that we are left to the determination of it upon what may appear to be sound principles of equity.

And I think it may safely be said, that a *feme covert* is a *feme sole* as to her separate estate, so far as to dispose of it, in any way, not inconsistent with the terms of the instrument.

[Leaycraft v. Hedden.]

under which she holds. Any danger apprehended from such rule, can be avoided by words restraining the disposition, or directing the precise mode in which it may be made.

If by the deed the husband has relinquished any right which he might have acquired in the estate by the marriage, and covenanted not to intermeddle therewith, but to permit the wife to dispose of it by deed, will, or otherwise, at her pleasure, her right of disposition remains as it was before the marriage, and then she is, in respect of the estate, *feme sole*. But if the terms of the deed require a particular mode of disposition, then as clearly those terms must be observed; her power is limited by them, and she is *feme sole sub modo*, and only to the extent of the power expressed.

This brings us, necessarily, to the consideration of the antenuptial deed, and whether its terms have been violated by the transactions between these parties.

Upon due consideration, I am satisfied that the deed of appointment, and the bond and mortgage executed in pursuance of it, are not inconsistent with the terms of the deed of trust; on the contrary, that the terms of that deed are sufficiently broad to cover both the rules contended for. By its express terms, the trustee covenanted among other things, to convey the said estates and property to such further and other uses, as she might, by writing under her hand and seal, direct and appoint. The defendant, by writing under hand and seal, duly executed, appointed and directed her trustee to execute the bond to the complainant, to secure the money due to him, and which she, at least, agreed to pay. As a further security, she directed him to execute a mortgage upon a certain part of her estate, which has since been exhausted, and for aught that appears, without fraud; but most unfortunately for the defendant, at a time when property was so depreciated, that a large residue of the amount secured by the bond is unpaid.

The only question is, was the bond so executed by the trustee, a conveyance, within the terms of the deed, of so much of her separate estate as should be necessary to pay it?

[Leaycraft v. Hedden.]

The term convey, although usually applied to real estate, is very comprehensive in its meaning, and implies a transfer, and assignment of personal property also.

By reference to the recital in the deed, and the covenant of the husband, we are enabled to see more fully in what sense the parties thereto understood it.

In the recital it appears that the parties had mutually agreed, that the intended husband should not interfere or meddle with her present or future acquired property, whether real or personal, and that the defendant should be permitted to make what disposition of the said property she might choose. And her intended husband covenanted that she might have the entire and absolute control over it, and dispose of the same by deed, will or otherwise at her pleasure.

The intention of the defendant, and of the person next most interested, was that she should have the absolute control of the property, and dispose of it at her pleasure. To carry out this intention, the trustee covenanted to convey the said estates and property as she should direct. The term convey must have been used as well in reference to the personal as to the real estate. And the direction to execute a bond, may in equity be regarded as an appropriation of so much of the estate as is necessary to pay it.

If there were a doubt upon this construction, the strong equity of the case would solve it. If the complainant forebore to the defendant money due to him, at her request, and as she thought for her benefit, common justice and equity demand that she should pay it.

I feel safe, therefore, in the conclusion, that pending the trust her separate estate might rightly have been charged with the amount of money due on the bond, but that she could not have been made personally liable.

The trust is now surrendered, and her separate estate held with her general property, and no means of distinguishing it is afforded to the court; and I can see no reason why a general decree of payment should not be made.

[Leaycraft v. Hedden.]

Let the matter be referred to a master, to ascertain the amount yet due on the bond, to the end that the defendant may be decreed to pay the same, with costs.

Order accordingly.